**Robert L. THIELE and Doris A. Thiele, Appellants (Plaintiffs Below),**

**v.**

**FAYGO BEVERAGE, INC., and Dugan-Doss, Inc., Appellees (Defendants Below).**

No. 4–1284A349.

Court of Appeals of Indiana, Fourth District.

Feb. 24, 1986.

Rehearing Denied April 18, 1986.

Philip R. Terrill, Mark A. Thoma, Peters & Terrill, Fort Wayne, for appellants (plaintiffs below).

Thomas W. Belleperche, Hunt, Suedoff, Borror & Eilbacher, Fort Wayne, for appellee (defendant below) Faygo Beverage, Inc.

1. The Thieles' do not appeal the trial court's grant of summary judgment to defendant Dugan-Doss, Inc.

2. We note that Faygo moved for complete summary judgment, which the trial court granted, but did not move separately for partial summary judgment on each of the four counts of the Thieles' complaint. We recognize that, by affirming in part and reversing in part, we are, in effect, granting Faygo partial summary judgment even though Faygo never requested such relief. We believe we are authorized to do so by Appellate Rule 15(N), which states, in relevant part:

"(N) Order or Relief Granted on Appeal. An order or judgment upon appeal may be reversed as to some or all of the parties and in whole or in part. The court, with respect to all or some of the parties or upon all or some of the issues, may order:

MILLER, Judge.

The plaintiffs-appellants, Robert and Doris Thiele, appeal the trial court's grant of summary judgment to the defendant-appellee, Faygo Beverage, Inc. (Faygo).[1] Robert Thiele suffered a severe eye injury while handling a case of Faygo pop bottles in the course of his employment as a grocery order worker for the Kroger Company (a chain of grocery stores) in their warehouse in Fort Wayne, Indiana. The Thieles alleged Faygo's liability for Robert's injury and Doris's loss of consortium and services in a four count complaint based on negligence, breach of express and implied warranties, the federal Magnuson-Moss Act, and strict liability in tort. Faygo's answer to the complaint generally denied the Thieles' allegations and asserted the affirmative defenses of contributory negligence, incurred risk, misuse, and failure to state a claim on which relief could be granted. The parties filed and answered interrogatories and submitted supporting affidavits, and Faygo took the deposition of Robert Thiele and submitted it in support of the motion for summary judgment. The trial court granted summary judgment to Faygo as to all four counts of the complaint, and the Thieles appeal, alleging the existence of genuine issues of material fact on each count, rendering the grant of summary judgment erroneous. We affirm in part and reverse in part.[2]

\* \* \* \* \* \*

(2) Entry of final judgment;
(3) Correction of a judgment subject to correction, alteration, amendment or modification;

\* \* \* \* \* \*

(6) Grant any other appropriate relief, and make relief subject to conditions.
The court shall direct final judgment to be entered or shall order the error corrected without a new trial unless such relief is shown to be impracticable or unfair to any of the parties or is otherwise improper...."
Ind. Rules of Procedure, Appellate Rule 15(N). Very recently our supreme court has said of Appellate Rule 15(N):

"This rule has been interpreted by commentators as indicating that a court of review should direct a final judgment with respect to a pure question of law or a mixed question of law and fact, but should refer cases involving

## STANDARD OF REVIEW

When reviewing the grant of a motion for summary judgment, this court applies the same standard as applied by the trial court in ruling on the motion in the first instance. *Barnes v. Wilson* (1983), Ind.App., 450 N.E.2d 1030.

"[W]e must determine whether there is any genuine issue of material fact, and whether the law was correctly applied. *Hale v. Peabody Coal Company,* (1976) 168 Ind.App., 336, 343 N.E.2d 316. The moving party has the burden of establishing that no material facts are in genuine issue. All doubts and inferences are resolved in favor of the non-moving party. *Podgorny v. Great Central Insurance Co.,* (1974) 160 Ind.App., 244, 311 N.E.2d 640.

A fact is material if its resolution is decisive of either the action or a relevant secondary issue. *Lee v. Weston,* (1980) Ind.App., 402 N.E.2d 23. The factual issue is genuine if it cannot be foreclosed by reference to undisputed facts, but rather requires a trier of fact to resolve the opposing parties' differing versions. *Stuteville v. Downing,* (1979) Ind.App., [181 Ind.App. 197] 391 N.E.2d 629.

In a word, we are to reverse if there is any genuine issue for the trier of fact to determine."

*Perry v. Northern Indiana Public Service Co.* (1982), Ind.App., 433 N.E.2d 44, 46. In determining the existence *vel non* of a genuine issue of material fact, this court will examine "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits and testimony, if any," Ind. Rules of Procedure, Trial Rule 56(C) [3] and construe these

---

resolution of disputed material facts back to the trial court for a hearing on the evidence. 4A Bagni, Giddings and Stroud, Indiana Practice Sec. 130 (1979)."

*B & R Farm Services, Inc. v. Farm Bureau Mutual Ins. Co.* (1985), Ind., 483 N.E.2d 1076, 1077 (vacating trial court's grant of summary for defendant and ordering entry of partial summary judgment for plaintiff, whose motion for partial summary judgment was denied by the trial court.) The basis for our partial affirmance of the trial court's judgment are pure questions of law—whether the count of the complaint for breach of implied warranty in tort is merged with the count for strict liability in tort and whether Robert Thiele was a "user or consumer" of Faygo's product as that phrase is defined in our Product Liability Act. The portion of the judgment we reverse, being based on a distinct theory and count of the complaint is an "independant and distinct entit[y], easily severable from the remainder of the judgment," and is thus the proper subject for a partial reversal. 4A BAGNI, GIDDINGS & STROUD, INDIANA PRACTICE Sec. 130 at 166 (1979).

Furthermore, this case does not present the danger present in the situation where an appellate court reverses summary judgment for one party, then orders summary judgment entered for the opponent even though the latter did not file a cross motion for summary judgment. *See* 10A WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 2720 at 34 (1983) ("[W]henever the [appellate] court believes that the non-moving party is entitled to judgment, great care must be exercised to assure that the original movant has had an adequate opportunity to show that there is a genuine issue and that his opponent is not entitled to

judgment as a matter of law.") Here, although the relief we grant in Faygo's favor is less than the complete relief it requested at trial, our approach to the decision—examining each count of the complaint and determining under the appropriate standard whether summary judgment was appropriate as to each—is exactly the approach taken by both parties in their memoranda on the summary judgment motion and their briefs on appeal. Clearly both parties have had an adequate opportunity to address, as to each separate count of the complaint, whether there was a genuine issue of material fact and whether Faygo was entitled to judgment as a matter of law.

Finally, the relief we grant is not more than could have been granted by the trial court. "In a proper case, the court may grant a partial summary judgment even though the party asks for a complete one." 73 Am.Jur.2d *Summary Judgment* § 41 at 770 (1974) (citing *Sumitomo Shoji New York, Inc. v. Isbrandtsen Co.* (1965), 23 App.Div.2d 752, 258 N.Y.S.2d 1020 (per curiam); *Gaylord v. Gaylord* (1947), 271 App.Div. 1045, 68 N.Y.S.2d 513 (per curiam)); *see* T.R. 56(C) ("A summary judgment may be rendered upon less than all the issues or claims, including without limitation the issue of liability or damages alone although there is a genuine issue as to damages or liability as the case may be.")

3. The Thieles have included an Appendix in their Appellant's Brief, which contains: (1) a letter written by an opthalmologist who examined and treated Robert Thiele's eye injury; (2) three photographs depicting cases of Faygo pop bottles in their setting at the Kroger warehouse; and (3) a photostatic copy of the opinion of the

**568**

materials liberally in favor of the non-moving party. *Perry v. NIPSCO, supra.*

## FACTS

The evidence contained in the Trial Rule 56(C) materials in this case indicates that on June 22, 1981, Robert Thiele was employed as a grocery order worker in the Kroger Co. warehouse and distribution center in Fort Wayne, Indiana. At the warehouse, bulk quantities of items to be sold in Kroger retail stores were received on the warehouse dock and then moved inside the warehouse, where the goods were stored on wooden pallets aligned in rows with open aisles running between the rows of inventory. Robert's job as grocery order worker was to receive an order for various items to be shipped from the warehouse to a particular Kroger store and to walk up and down the aisles, picking the ordered

---

Supreme Court of Mississippi in *Falstaff Brewing Corp. v. Williams* (1970), Miss., 234 So.2d 620. These materials were neither sworn statements nor introduced as exhibits during Robert Thiele's deposition. In determining whether a genuine issue of material fact exists for purposes of deciding a summary judgment motion, a court may not rely on supporting materials other than those in the form intended by Trial Rule 56. *Conard v. Waugh* (1985), Ind.App., 474 N.E.2d 130, 133–34 (citing 3 W. HARVEY, INDIANA PRACTICE § 56.6 at 556 (1970)). Thus, we may not consider facts alleged or represented in the opthalmologist's letter or the photographs included in the Appendix to the Appellant's Brief, and to the extent of those two items, Faygo's motion to strike the Appendix from the Appellant's Brief is granted. The copy of the opinion of the Supreme Court of Mississippi, however, does not attempt to present facts that would influence the determination of the existence of a genuine factual issue, but rather presents a legal argument the Thieles believe helpful to their case. As such, it need not be struck from the Appellant's Brief.

Faygo has also filed a motion to strike the Thieles' Reply Brief on the ground that the brief was not timely filed. Indiana Rules of Procedure, Appellate Rule 8.1(A) requires that the appellant file his reply brief within fifteen days after the filing of the appellee's brief. Faygo's Appellee's Brief is file-stamped May 9, 1985, and the Thieles' Reply Brief is file-stamped twenty days later, May 29, 1985. Thus, on the face of the matter, it appears the Thieles' brief was not filed within the time limits of the appellate rule. The Thieles attempt to avoid the motion to strike, however, relying on the provisions of Appellate Rule 12(C) and (D), which, in relevant part, state:

"(C) Method of Filing and Serving Motions, Petitions, Briefs, the Record of Proceedings, and Other Papers. Motions, petitions, briefs, the record of proceedings, and other papers will be deemed filed with the clerk or served upon the opposing party or his counsel upon the deposit of the same in the United States Mail or with any properly bonded carrier, charges prepaid, properly addressed, to the clerk or to the opposing party or his counsel as the case may be.…

(D) Extension of Time for Service by Mail. In any and all cases where motions, petitions, briefs and other papers are served upon the opposing party or his counsel by mail or with any properly bonded carrier, *the time period specified for filing of any answers or briefs with the clerk in response thereto shall be extended* automatically and without order of court for an additional period of five days from the date of such deposit in the United States Mail or with any properly bonded carrier." (Emphasis added.)

The Thieles argue that, because their reply brief was served by mail, they are entitled to an automatic extension of five days for filing the brief under Appellate Rule 12(D). Adding this five-day period to the fifteen-day period of Appellate Rule 8.1(A), and measuring from May 9, 1985—the day Faygo's Appellee's Brief was filed—the Thieles contend the Reply Brief was timely filed within the resulting twenty-day period ending May 29, 1985, when the brief was deposited in the mail. As the emphasized language above clearly indicates, however, the Thieles have misinterpreted Appellate Rule 12(D). The five-day automatic extension does not apply to a party who serves a brief by mail, but rather to a party who responds to a brief that was served by mail. The Thieles do not allege, and the record does not indicate, that Faygo's Appellee's Brief was served by mail; therefore, the five-day automatic extension does not apply to the Thieles' "response thereto"—the Reply Brief—and the brief was, thus, filed five days late. Faygo's motion to strike the Reply Brief is granted.

Finally, the Thieles have filed a motion to strike the Statement of Facts section of Faygo's Appellee's Brief on the ground that Faygo has improperly intermingled argument with the statement of facts. While it is true that "our [appellate] rules forbid the inclusion of argument in the facts," *Donahue v. Lafayette Bank and Trust Co.* (1983), Ind.App., 449 N.E.2d 1156, 1157 n. 1; *see* Appellate Rule 8.3(A), we do not find that the entirety of Faygo's Statement of Facts is so infected with argument that it is appropriate to strike that whole section of the Appellee's Brief. The last paragraph of that section, however, is pure argument, and to the extent of that paragraph, the Thieles' motion to strike is granted.

goods from the pallets and placing them on a machine (similar to a forklift) known as a pallet jack. Before the goods were loaded from the line of pallets to the pallet jack, the grocery order worker was to stick a coded label on each case of goods picked, indicating the date of the order, the type, quantity and price of the goods, and their shipment destination.

Cases of Faygo pop were delivered in bulk, on wooden pallets, to the Kroger warehouse in Faygo trucks. A Kroger employee unloaded the pallets from the truck to the warehouse dock using a forklift. Robert Spear, a Kroger employee who worked on the warehouse dock, swore an affidavit that was filed in support of the Thieles' opposition to Faygo's motion for summary judgment. In his affidavit, Spear stated that on June 22, 1981 and for many years prior thereto, his duties at the Kroger warehouse included unloading Faygo pop from Faygo trucks; that he always unloaded the Faygo pop in bulk on pallets with the aid of a forklift; and that in performing this duty, he always used due care and in no way mishandled the cases and pallets of Faygo pop in such a way as to cause any pop bottles to break or explode. Other evidence indicated the pallets of Faygo pop would remain on the dock for no more than an hour before another Kroger employee moved them—again, in bulk—into the proper area of the warehouse, where the cases of pop would remain until individual cases were picked by a grocery order worker to fill an order for shipment to a Kroger retail store. As much as a month might elapse between the time a particular case of Faygo pop arrived at the Kroger warehouse and the time it was picked for shipment to a Kroger store. In his deposition, Robert Thiele stated he did not know how long the particular case of pop that allegedly caused his injury had been in the warehouse at the time of his injury.

A case of Faygo pop consists of twenty-four 16-ounce bottles that sit in a cardboard carton that covers the lower one-half to two-thirds of the bottles. A piece of polyethelene plastic is laid on top of the case of bottles, then heated to shrink around the final package. The plastic covers the top of the bottles, the sides of the cardboard carton, and comes together on the underside of the case, virtually enclosing the entire package in plastic. Robert Thiele stated in his deposition that a pallet of cases of Faygo pop consists of approximately six layers of cases stacked on top of one another and that, at most, two or three pallets might be stacked together. Robert did not know whether other cases or pallets had ever been stacked on top of the case of Faygo pop that allegedly caused his injury.

At the time of his injury, Robert was picking an order for a case of Faygo pop for shipment to a Kroger retail store. The case of pop in question was stacked on top of other cases, on a pallet, resting at about waist level. Standing a bit in back of the case of Faygo pop in order to stick the coded label on the side, Robert bent over to lift the case from the storage pallet onto the pallet jack. In his deposition, Robert testified to the occurrence of his injury as follows:

Q. [by attorney for Faygo] Were you doing it [moving the case of pop] with your bare hands?

A. [by Robert Thiele] Yes.

Q. Did you lift this case?

A. Yes.

Q. It was cardboard, I take it?

A. Yes.

Q. When you lift one of these cardboard cases, does it become concave, or does it move at all? Is there any flexibility to that cardboard case?

A. Some.

Q. Am I saying it correctly? Does it become a little bit looser, or how does it work?

A. Yeah. It's a cardboard box that's open on top. That's why it's wrapped in plastic. But the sides of the case are, I'd say, roughly maybe four inches high. And that's the cutoff point there. And then the bottles are setting down in this case

that's wrapped in plastic. So naturally, its not going to be as firm as a closed-in case. It does flex somewhat.

. . . .

Q. And you were going to move it from your right to your left?

A. Yes.

Q. And you reached over and you picked it up. When you first picked it up, how far from your eye would this case be?

A. Oh, I'd say about two feet.

Q. Is there anything unusual that you noticed about the case when you picked it up?

A. No.

Q. Did you look at it?

A. No.

Q. Nothing about it seemed unusual to you?

A. No.

Q. Have you ever moved a case or cans or boxes of anything in which you noticed any kind of problems, Faygo or anything else?

A. No.

Q. So insofar as when you reached over and picked up the case of this pop, everything seemed to be okay, am I right?

A. Yes.

Q. And you turned to your left to place it on the machine.

A. Yes.

Q. Now, would you tell me, with what force did you put it on the machine? Did you put it down very gently, did you kind of throw it over there, or how does it work?

A. Well, we pull our machine up along as we go, to work orders, and we roughly keep it about two feet away so you've got room to walk between the machine and the product you're picking, and I—You can stand there in one spot and turn from item to item, roughly. But it's about two feet away, and you just make a turn and put it down on the machine more gently than anything else, because you know it's glass. And that's about it. I didn't throw it down hard, just gently.

Q. Do you place it down as opposed to dropping it?

A. No, you place it because you can't put it just anywhere. You've got to put a lot of stuff on one pallet, so you've got to watch the order you put it on. There's certain, different ways you put some items.

Q. With respect to this, because it's glass, though, you put it down gently.

A. Uh-huh (affirmative).

Q. Am I saying that correctly?

A. Yes.

Q. Now when you put it down gently, how much give is there in the case, in particular, this case? Do you remember?

A. Well, as you're picking it up, it might flex some, like you said, but when you put it down on a load, if you put it on top of something else that's flat, it'll set flat.

Q. And I take it, from the way you're describing the way you placed it down, there would not have been much in the way of movement, or would there have been, in terms of the sides being flexible and the bottles moving around and the top becoming looser?

A. Not a whole lot. It would probably—it would move some.

(R. 274–78)

Q. When you reached over and you placed the case of Faygo pop onto the machine—It did reach the machine, didn't it?

A. Yes.

Q. —when is the first time you noticed any problem in your eye?

A. After I put it down.

Q. Were you still over it when you first felt some kind of a problem?

A. Yes.

Q. And about how far from your eye would the case be then?

A. Oh, about two feet.

Q. You never got much closer than two feet from your head or your eye to the case from the time you first lifted it to the time you placed it?

A. No.

Q. At no time you observed anything unusual or anything broken?

A. No.

Q. At no time you observed anything unusual or anything broken?

A. No.

Q. Immediately following the sensation to your eye—would you describe that to me, by the way?

A. Okay. I put the case down, I felt something hit—a piece of glass flew up and hit my eye. I stood up right away, and I felt a liquid of some kind. I didn't know if it was bleeding or watering or what, so I put my hand up to my eye or my cheek, and I felt water. And I seen it wasn't blood, it was liquid, so I got my hankie out and dried it up, because I knew right away something was wrong. I couldn't see out of it.

Q. You stated that you placed the case down and the glass flew up and hit you in the eye. Do you know that as a matter of fact? Did you see the glass there following this incident?

A. Well, after it happened, I looked down at the case, and there was four broken bottles in it, and there was glass all over the top of it.

Q. But you didn't notice this when you first lifted the case?

A. No.

Q. Could you describe the bottles to me? When you say broken, do you mean shattered, do you mean—

A. There was four bottles, roughly about in the middle of the case, the best I can remember, and they were just broken, all little pieces broke down, just like broke into pieces and settled.

Q. Where was the glass?

A. It was in the case.

Q. Underneath the plastic?

A. Yes.

Q. Did you see any glass on top of the plastic?

A. Yes.

Q. So there was glass on top of the plastic, underneath the plastic in the case.

A. Yes.

Q. Did you notice anything on the ground?

A. Yes. There was one piece laying on the floor.

Q. How big a piece was it?

A. Oh, I'd say about the size of a dime.

Q. This is the glass?

A. Yes.

Q. And you didn't notice any of this when you lifted up the case?

A. No.

Q. Had you ever seen broken bottles before in these cases?

A. No.

Q. Was it easy to see? When you looked at the case, after you felt the sensation to your eye, could you easily see right away that there were four broken bottles in there?

A. Yes.

(R. 280–82)

Q. In all the cases of Faygo pop that you've moved before working at Kroger, or any other glass goods— and I take it there are other things that you have glass in them, other than Faygo pop bottles, in the warehouse—

A. Yes.

Q. —have you ever seen any broken glass before?

A. No. You mean Faygo or of other products?

Q. Of any product, Faygo or other products.

A. There's times that stuff gets broken, that we may see it laying around or something.

Q. But I mean, have you ever moved baby food or anything else that might come in glass containers that you've seen that have been broken before?

A. Yeah, I've seen it broken before.

Q. Are there several products besides the Faygo that come in glass, in that warehouse?

A. Yeah, there's other—quite a few products.

Q. Do you have any information as to how the glass that you say was on top of the plastic got on top of the plastic of this Faygo case?

A. No.

Q. As the plastic sits on top of the case of Faygo, is there any way for anything to get down from the plastic into the case, if it were sitting on top of it, or is it sealed pretty tight around those caps?

A. It's sealed—It's thin enough you could push something down through it if you wanted to, yes.

Q. What is your opinion as to how the glass that was on top of the plastic got on top of the plastic?

A. It could have been there before. I don't know. I would assume it exploded from those bottles and flew on top of the case.

Q. Was there anything wrong with the case, or was the plastic torn, or were there holes in it or anything like that?

A. I really don't—It happened so quick, I just was worried about my eye. I didn't look. I just glanced down and seen—I don't remember if the plastic was broke or not. I know there was four broken bottles in it.

Q. When, in your opinion, were those bottles broken?

A. After I handled it, I put it down. (R. 292–94)

In reply to another deposition question, Robert stated the glass that allegedly struck his eye could not have come from anyplace other than the case of Faygo pop he was handling. Robert was examined by an opthalmologist, but no glass or any other foreign particle ever was found in his eye. As a result of his injury, Robert completely lost the vision in the injured eye. The case of Faygo pop Robert was handling when injured apparently was sent to a Kroger retail store; it was not preserved as evidence.

## DECISION

The primary dispute between the parties—which runs through their arguments concerning the summary disposition of each of the four counts of the complaint—centers on the relative burdens of proof involved in the procedural setting of this case. Faygo, relying on the familiar adage that negligence may not be inferred from the mere fact of an accident, *see Haynie v. Meyer* (1966), 139 Ind.App. 663, 215 N.E.2d 886, insists that the Thieles have failed to meet their burden of demonstrating a specific act of negligence on Faygo's part or a specific defect in the Faygo product that proximately caused Robert's injury. Faygo contends that no basis for negligence, breach of warranty or strict liability is disclosed by the undisputed facts of this case and that summary judgment was appropriate because Faygo was entitled to judgment as a matter of law based on those facts.

The Thieles, on the other hand, contend that Faygo's negligence, breach of warranty and strict liability may be inferred from the evidence available in this case. They note that even if the facts are not in dispute, summary judgment is not appropriate if a good faith dispute exists between the parties regarding the inferences to be drawn from those facts. *See McCullough v. Allen* (1983), Ind.App., 449 N.E.2d 1168. The Thieles also rely on the proposition that, in a summary judgment

setting, the moving party bears the burden of proving no genuine issue of material fact exists; thus, they argue, "a defendant [here, Faygo] seeking summary judgment must set forth specific facts negating the plaintiff's claim," *id.* at 1171, and only then must the plaintiff present specific facts demonstrating a genuine factual issue. *Id.*, T.R. 56(E); *cf. Conard v. Waugh* (1985), Ind.App., 474 N.E.2d 130 (in summary judgment proceeding, where defendant asserts and presumptively establishes statute of limitations defense, burden of establishing material facts in avoidance of that defense shifts to plaintiff). The Thieles allege the trial court erred in granting Faygo summary judgment because Faygo failed to meet its burden of setting forth facts negating their claim and, therefore, failed to disprove the existence of any genuine issue of material fact.

In the abstract, we agree with all of the general principles of law asserted above by both parties. Our duty, however, in this, as in every other case where the grant of summary judgment is challenged, is to review the available Trial Rule 56(C) materials with these general principles in mind and to determine whether there exists any genuine issue of material fact for the trier to decide. *Perry v. NIPSCO, supra.* If any such issue exists as to any count of the Thieles' complaint, we must reverse the trial court's grant of summary judgment as to that count.

### Negligence

In Count I of their complaint, the Thieles alleged that Faygo negligently designed, manufactured, bottled, packaged, distributed and transported the case of Faygo pop Robert was handling at the time of his injury, and that Faygo negligently failed to inspect its product and to warn Robert of the dangerous condition of the case of pop. On appeal, the Thieles have focused on the allegedly negligent design of the case of Faygo pop. The Thieles claim that the evidence in this case supports the theory that the design of Faygo's case of pop—a flexible cardboard box wrapped tightly in polyethylene plastic—was such that when the case was lifted, the cardboard box flexed toward the middle, causing the plastic wrapper to sag. When the case was set on a flat surface, the cardboard box returned to its normal, flat position, causing the plastic wrapper to spring back to its original, stretched position, producing a "trampoline effect" that would catapult any loose fragments of glass or other debris from the top of the case up into the air. The Thieles contend that a reading of Robert's deposition in a light favorable to the Thieles—non-movants in this summary judgment proceeding—supports the factual inference that there was glass on top of the case of Faygo pop in question at some time before Robert set the case down on the pallet jack and that this glass was thrown up into Robert's eye. We agree that such an inference may be supported by a liberal construction of the Trial Rule 56(C) materials in the Thieles' favor. *See Perry v. NIPSCO, supra.* The question remains whether, even assuming this factual inference to be true, Faygo is nevertheless entitled to judgment as a matter of law because this and other facts in this case raise no legal inference of negligence. We find Faygo is not entitled to judgment on these facts.

Our supreme court has defined negligence as follows:

"In Indiana the tort of negligence is comprised of three elements: (1) a duty on the part of defendant in relation to the plaintiff; (2) failure on the part of defendant to conform its conduct to the requisite standard of care required by the relationship; and (3) an injury to the plaintiff resulting from that failure."

*Miller v. Griesel* (1974), 261 Ind. 604, 610–11, 308 N.E.2d 701, 706. The third element—an injury resulting from the defendant's failure of care—it is more traditionally described in terms of whether the defendant's substandard conduct was the "proximate cause" of the plaintiff's injury. *See, e.g., Bailey v. L.W. Edison Charitable Foundation* (1972), 152 Ind. App. 460, 284 N.E.2d 141.

Faygo does not suggest that the manufacturer of a product owes no duty of care to a "middle man" who comes into contact with the product after it has entered the stream of commerce but before it reaches the ultimate user or consumer of the product.[4] Thus, Faygo would be entitled to summary judgment on the negligence count of the complaint only if it could meet its burden of demonstrating that the material facts of this case show, without issue, that Faygo did not breach its duty of care owed to Robert Thiele *or* that such breach was not the proximate cause of Robert's injury.

Faygo places a great deal of reliance on the proposition that "if a plaintiff cannot show the manner in which an accident took place, unexplained circumstances do not permit *the jury* to speculate or draw inferences as to the occurrence." Appellee's Brief at 13 (our emphasis). Faygo cites three soft drink bottle cases where this proposition has been applied; however, the procedural setting of all three cases was different from the summary judgment setting in the present case. *See Smith v. Michigan Beverage Co.* (7th Cir.1974), 495 F.2d 754 (appeal from judgment entered on jury verdict); *Pardue v. Seven-up Bottling Co.* (1980), Ind.App. 407 N.E. 1154 (same); *Baker v. Coca-Cola Bottling Works* (1961), 132 Ind.App. 390, 177 N.E.2d 759 (appeal from directed verdict). In a summary judgment setting: "The moving party bears the burden of proving that no issue

4. Nor do we believe that Faygo could argue it owed no duty to Robert Thiele. "The law requires every person to exercise due care to avoid foreseeable injury to others." *Stapinski v. Walsh Construction Co.* (1978), Ind.App., 383 N.E.2d 473, 476, *vacated on other grounds*, (1979) 272 Ind. 6, 395 N.E.2d 1251 (vacated on grounds of intervening cause); *see Lake Shore & Mich. S. Ry. Co. v. Brown* (1908) 41 Ind.App. 435, 84 N.E. 25. The duty of reasonable care is not, of course, owed to the world at large, but rather to those who might reasonably be foreseen as being subject to injury by the breach of the duty. In the words of Justice Cardozo, then chief judge of the Court of Appeals of New York, "The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension." *Palsgraf v. Long Island R. Co.* (1928), 248 N.Y. 339, 344, 162 N.E. 99, 100.
Indiana follows this "foreseeability-relationship" formulation of the question of whether the defendant in a negligence case owed a duty of care to the plaintiff:
"It is axiomatic that the conduct of a person will give rise to an action for negligence only if that person owed a duty to the plaintiff to conform his actions to a standard of care. The existence of such a duty is a question of law. *Koroniotis v. LaPorte Transit, Inc.* (1979), Ind.App. 397 N.E.2d 656....
Generally, a legal duty arises from the nature of relationships between people. *Neal v. Home Builders, Inc.,* (1953), 232 Ind. 160, 111 N.E.2d 280; *Allied Fidelity Insurance Co. v. Lamb* (1977), Ind.App., 361 N.E.2d 174. Also relevant in determining the existence of a duty is one's knowledge of the situation or circumstances surrounding the relationship. *Snyder v. Mouser* (1971), 149 Ind.App. 334, 272 N.E.2d 627."

*Lawson v. Howmet Aluminum Corp.* (1983), Ind. App., 449 N.E.2d 1172, 1177. The question of law in this case is whether Faygo owed a duty of reasonable care to Robert Thiele.

The relationship between Faygo and Robert Thiele was that of the manufacturer of a product and a "middle man" who handled the product as it flowed through the stream of commerce toward the ultimate user or consumer. This relationship operated to the benefit of the manufacturer, Faygo, because the labor of the middle man, Robert, was necessary to move the product into the hands of the purchasing public.

Concerning Faygo's knowledge of the circumstances surrounding its relationship with Robert, the evidence in this case shows that Faygo employees delivered the cases of pop in Faygo trucks to the Kroger warehouse, where they were unloaded in bulk on the warehouse receiving dock. Faygo knew its cases of pop ultimately would be delivered to Kroger retail stores for display and sale to the public. Indeed, the viability of Faygo's business as a soft drink manufacturer relies on such disposition of its product. Therefore, Faygo must have known its cases of pop would be handled by Kroger's "middle men" employees before reaching the ultimate consumer.

Given the relationship between Faygo and Robert Thiele and Faygo's knowledge of the circumstances surrounding that relationship, it was reasonably foreseeable that if Faygo did not use reasonable care to design a safe package for its cases of pop, those who handled the package in the stream of commerce, including Robert, would be subject to injury due to its negligent design. The foreseeability of such harm to Robert imposed upon Faygo the duty to take due care to avoid it. *Stapinski v. Walsh Construction Co., supra.*

of material fact exists. Thus, a defendant seeking summary judgment must set forth specific facts that negate the plaintiff's claim. *This is true even though the plaintiff would have the burden of proof at trial." McCullough v. Allen* (1983), Ind. App., 449 N.E.2d 1168, 1171 (emphasis added, citations omitted).

 The Thieles claim that the design of Faygo's packaging for its cases of pop created an unreasonably dangerous "trampoline effect" and constituted a failure by Faygo to conform its conduct to the standard of reasonable care upon which the question of breach of duty depends. *See Memorial Hospital of South Bend, Inc. v. Scott* (1973), 261 Ind. 27, 300 N.E.2d 50. Breach of duty is a question usually reserved to the trier of fact but may be decided as a matter of law where the facts are undisputed and lead to but a single inference of conclusion. *Petroski v. Northern Indiana Public Service Co.* (1976), 171 Ind.App., 14, 354 N.E.2d 736. In attempting to negate the Thieles' claim, Faygo filed an affidavit sworn by Harvey Lipsky, the head of Faygo's Technical Division in charge of its quality control and research and development programs. Attached to the affidavit is a document labelled "Proposed Voluntary Product Standard TS 231" (hereinafter referred to as the PVP Standard). Lipsky's affidavit indicates that the PVP Standard is the result of Faygo's Technical Staff's work with the Consumer Product Safety Commission in developing standards for the bottling industry. For a number of reasons, we find that Lipsky's affidavit and the PVP Standard fail to satisfy Faygo's burden of demonstrating there is no genuine issue of material fact on the question of breach of duty in this case.

First, a careful reading of the PVP Standard reveals that it details standards primarily for the glass bottles in which Faygo pop is delivered and for the process of filling such bottles. The Thieles' allegation of Faygo's negligence is directed at the reasonableness of the design of the cardboard and plastic cases in which the bottles

of pop are packaged and transported. Such reference as there is to standards for such cases in the PVP Standard states: "All new paperboard basket carriers, paperboard wraps, corrugated trays and reshippers purchased shall be those represented by the individual item manufacturer as complying with NSDA Secondary Glass Packaging Voluntary Specification Guideline for Paperboard and Corrugated Board Systems, NSDA, November, 1982." (R. 179) The "Secondary Glass Packaging" standards referred to do not appear in the record, and, therefore, neither Lipsky's affidavit nor the PVP Standard address the question of the reasonableness of the design of Faygo's cases of pop.

Second, even if the PVP Standard had addressed the design of Faygo's cases of pop, the standard is dated February, 1984, more than two and one-half years after Robert Thiele's injury. Thus, the standard could not have affected the reasonableness of the design of Faygo's cases of pop at any time relevant to this cause of action.

Finally, it is well settled that the standards set by an industry do not define the standard of reasonable care against which the conduct of a manufacturer in that industry will be measured in a negligence case. *See The T.J. Hooper* (2d Cir.1952), 60 F.2d 737; *Gilbert v. Stone City Construction Co.* (1976), 171 Ind.App. 418, 357 N.E.2d 738. Indeed, the PVP Standard appears to recognize this principle where it states: "Conformance with this Standard is not to be interpreted to mean all packages will be free of defects." (R. 178)

 Therefore we conclude the Lipsky affidavit and the PVP Standard fail to satisfy Faygo's burden of demonstrating there is no genuine issue of material fact regarding Faygo's breach of its duty to use reasonable care to design a safe package for its product, and therefore, Faygo was not entitled to summary judgment on Count I on the basis of that element of negligence. We now turn to the question of whether there was any genuine factual issue regarding the element of proximate cause.

Like breach of duty, proximate cause is generally an issue for the trier of fact and may be decided as a matter of law only when the facts are undisputed and lead to but a single inference of conclusion. *Petroski v. NIPSCO, supra.* The Trial Rule 56(C) evidence available in this case indicates that although Robert did not notice anything unusual about the case of Faygo pop that allegedly caused his injury when he bent over to pick it up, he also stated in his deposition that he did not look at the case. Robert stood slightly in back of the case of pop in order to stick the coded inventory label on the side. When he picked up the case of pop, it flexed toward the middle somewhat, and when he set the case down on the pallet jack, Robert's face was within two feet of it. At that moment, Robert experienced a painful sensation in his eye and felt some liquid running down his face. Robert then noticed four broken bottles inside the case he had handled, loose glass scattered over the plastic on top of the case, and a dime-sized piece of glass lying on the warehouse floor. In deposition, Robert also stated the glass could have been on top of the case of pop before he first noticed it after his injury.

The Thieles contend that, when construed in their favor, as non-movants in this summary judgment proceeding, *see Perry v. NIPSCO, supra,* the evidence just recited supports a reasonable inference that the proximate cause of Robert's injury was the design of the case of Faygo pop in which the polyethylene plastic wrapped tightly around the flexible cardboard box created a "trampoline effect" that caused a piece of glass to be thrust into Robert's eye. In the procedural setting of this case, we must agree. Moreover, Faygo has failed to direct our attention to any evidence that satisfies its burden of demonstrating beyond issue that Robert's injury could not have been caused in the manner the Thieles allege or that it must have been caused in some other way. The affidavit of Harvey Lipsky and the PVP Standard attached thereto are insufficient for this purpose for the same reasons they were insufficient to exclude the existence of a genuine issue of material fact on the question of breach of duty. Faygo's contentions concerning the length of time the case of pop in question was in the Kroger warehouse, the number of Kroger employees who might have handled that case, the manner in which the inventory of Faygo stock was rotated in the Kroger warehousing system and the possible sources of the broken glass discovered on top of the case of pop after Robert's injury are all matters for the trier of fact to resolve.

Therefore, we hold the trial court erred in granting Faygo's motion for summary judgment on the negligence count of the Thieles' complaint because Faygo failed to sustain its burden of establishing that there was no genuine issue of material fact on the questions of breach of duty and proximate cause. *See McCullough v. Allen, supra.*

### Breach of Warranty

Count II of the Thieles' complaint alleged that Faygo breached implied and express warranties regarding its product. On appeal, the Thieles limit their argument to Faygo's breach of implied warranty of merchantability. Thus, they have waived any arguments concerning breach of express warranty or the implied warranty of fitness for a particular purpose. *Whisman v. Fawcett* (1984), Ind. 470 N.E.2d 73; Ind. Rules of Procedure, Appellate Rule 8.3(A)(7).

Acknowledging the absence of privity of contract between Robert Thiele and Faygo, the Thieles contend that their action for breach of implied warranty sounds in tort and that privity is not a prerequisite to such an action. *See Wright Bachman, Inc. v. Hodnett* (1956), 235 Ind. 307, 133 N.E.2d 713 (action for breach of warranty may be based on contract or tort, depending on allegations of complaint); *Lane v. Barringer* (1980), Ind.App., 407 N.E.2d 1173 (privity of contract not required if personal injury action for defective product sounds in tort). The Thieles argue that Faygo has failed to demonstrate there is no genuine issue of material fact on the war-

ranty issue and that summary judgment was, therefore, erroneously granted to Faygo. Faygo contends, however, that the Thieles' Count II for breach of implied warranty sounding in tort and without privity is duplicitous of Count IV alleging strict liability in tort and that the two counts cannot stand together in the same lawsuit. *See, e.g., Neofes v. Robertshaw Controls Co.* (S.D.Ind.1976), 409 F.Supp. 1376. We agree with Faygo's contention.

■ The theory of recovery known as breach of implied warranty in tort is distinct from the breach of implied warranty theories found in the Uniform Commercial Code. The UCC as adopted in Indiana provides for an action for breach of implied warranty of merchantability, I.C. 26–1–2–314 (1982), and for breach of implied warranty of fitness for a particular purpose, *id.* § 2–315. It is clear, however, that these warranties are implied "in a contract for ... sale," *id.* § 2–314, "at the time of contracting" *id.* § 2–315, and that the UCC was drafted in contemplation of a contract between a seller and his immediate buyer. PROSSER & KEATON, HANDBOOK OF LAW OF TORTS § 97 at 691 (5th ed. 1984). Thus, the theory of recovery labelled "breach of implied warranty in tort," which does not require privity of contract, must be something different from the implied warranty actions under the UCC.

Our supreme court, in *Wright Bachman, Inc. v. Hodnett* (1956), 235 Ind. 307, 313, 133 N.E.2d 713, 716, stated "It is well settled that an action of breach of warranty may be either a contract action or a tort action, depending on the allegations of the complaint. The seller's warranty has been described as a curious hybrid of tort and contract, unique in the law." (Footnotes omitted.) The court made no attempt, however, to delineate the distinct allegations that would cause one complaint for breach of warranty to sound in contract and another to sound in tort. It is apparent, however, that the tort action for breach of warranty referred to by our supreme court in *Wright Bachman* was not the no-privity sort of warranty action the Thieles' attempt to assert in the present case, but rather a tort action for deceit where the seller's warranty was fraudulent.[5] *See* 77 C.J.S. *Sales* § 354 at 1262 (1952), *quoted in Wright Bachman*, 235 Ind. at 313 n. 5, 133 N.E.2d at 716 n. 5.

We are not certain that the theory of breach of implied warranty in tort asserted by the Thieles was ever a viable theory of recovery in this state. Our research discloses not one decision under Indiana law in which a plaintiff brought a personal injury action against a defendant with whom he was not in privity of contract that reached a result favorable to the plaintiff on the theory of breach of implied warranty sounding in tort. It appears, instead, that the plaintiffs' victories have been won on the grounds of strict liability in tort. *See Corbin v. Coleco Industries, Inc.* (7th Cir.1984), 748 F.2d 411 (summary judgment for defendant-manufacturer affirmed on theories of breach of express and implied warranties sounding in contract and in tort, and reversed on theories of negligence and strict liability in tort); *Huff v. White Motor Corp.* (7th Cir.1977), 565 F.2d 104 (summary judgment for defendant-manufacturer reversed on theory of strict liability in tort); *Dagley v. Armstrong Rubber Co.* (7th Cir. 1965), 344 F.2d 245 (dismissal in favor of

---

5. *But see McCarty v. Williams* (1915), 58 Ind. App. 440, 108 N.E. 370, distinguishing an action for deceit from an action for breach of warranty:

"A warranty rests upon contract, while fraud or fraudulent representations have no element of contract in them, but are essentially a tort. When judges or law writers speak of a fraudulent warranty, the language is neither accurate nor perspicuous. If there is a breach of warranty, it cannot be said that the warranty was fraudulent, with any more pro-

priety than any other contract can be said to have been fraudulent, because there has been a breach of it. On the other hand, to speak of a false representation as a contract or warranty, or as tending to prove a contract or warranty, is a perversion of language and of correct ideas."

*Id.* at 444–45, 108 N.E. at 372 (quoting *Rose v. Hurley* (1872), 39 Ind. 77, 81). Thus, it seems the confusion concerning breach of warranty as a contract or a tort action is not of recent origin.

defendant-manufacturer reversed on theory of strict liability in tort); *Neofes v. Robertshaw Controls Co.* (S.D.Ind.1976), 409 F.Supp. 1376 (defendant-manufacturer's motion to dismiss granted on theory of breach of warranty in contract and denied on theory of strict liability in tort); *Withers v. Sterling Drug, Inc.* (S.D.Ind.1970), 319 F.Supp. 878 (defendant-manufacturer's motion for summary judgment granted on theories of negligence, strict liability in tort, and breach of implied warranty in contract and in tort); *Greeno v. Clark Equipment Co.* (N.D.Ind.1965), 237 F.Supp. 427 (defendant-manufacturer's motion to dismiss denied on theory of strict liability in tort); *Whittaker v. Federal Cartridge Corp.* (1984), Ind.App., 466 N.E.2d 480, *trans. dismissed* (summary judgment for defendant-manufacturers reversed on theory of strict liability in tort); *SCM Corp. v. Letterer* (1983), Ind.App., 448 N.E.2d 686, *trans. denied* (directed verdict for defendant-manufacturer on theory of breach of implied warranty not appealed; judgment on jury verdict for plaintiff on theory of negligence/res ipsa loquitur reversed; new trial ordered on theory of strict liability in tort); *Chrysler Corp. v. Alumbaugh* (1976), 168 Ind.App. 363, 342 N.E.2d 908, *modified on other grounds* 348 N.E.2d 654 (judgment on jury verdict for plaintiff affirmed on theory of strict liability in tort); *Perfection Paint & Color Co. v. Konduris* (1970), 147 Ind.App. 106, 258 N.E.2d 681 (judgment on jury verdict for plaintiff affirmed on theory of strict liability in tort).

Between 1965 and 1973, Indiana courts, following the national trend, adopted as the law of this state the theory of strict liability in tort as stated in section 402A of the Restatement (Second) of Torts (hereinafter referred to as section 402A).[6] The adoption of section 402A began in the federal court system, *see Greeno v. Clark Equipment Co., supra,* followed by the Indiana Court of Appeals, *see Cornette v. Searjeant Metal Products, Inc.* (1970), 147 Ind. App. 46, 258 N.E.2d 652, and finally the Indiana Supreme Court, *see Ayr-Way Stores, Inc. v. Chitwood* (1973), 261 Ind. 86, 300 N.E.2d 335. It is apparent to us that in adopting section 402A and giving it life as the law of this state, the courts signalled the end of whatever advances had been made by the theory of breach of implied warranty in tort. Clearly, the latter theory if ever it was viable in this state, became merged with the theory of strict liability in tort under section 402A.

In *Greeno v. Clark Equipment Co.* (N.D.Ind.1965), 237 F.Supp. 427, the plaintiff sued the manufacturer of an allegedly defective fork lift truck for personal injuries on five theories including breach of implied warranty and strict liability in tort based on section 402A. The federal district court for the Northern District of Indiana quoted the text of section 402A, *supra* n. 6, and then related it to the theory of implied warranty as follows: "Without attempting an exhaustive explanation, it may fairly be said that the liability which this section would impose is hardly more than what exists under implied warranty when stripped of the contract doctrines of privity, disclaimer, requirements of notice of defect, and limitation through inconsistencies with express warranties." 237 F.Supp. at 429. We should note that the theory of

---

**6.** § 402A. Special Liability of Seller of Product for Physical Harm to User of Consumer
(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
(a) the seller is engaged in the business of selling such product, and
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although
(a) the seller has exercised all possible care in the preparation and sale of his product, and
(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.
RESTATEMENT (SECOND) OF TORTS § 402A (1965).

tortious breach of implied warranty asserted by the Thieles does not include the "contract doctrines" named above.

The district court in *Greeno* also stated:

"It is generally recognized that implied warranty is more properly a matter of public policy beyond the power of the seller to alter unilaterally with disclaimers and inconsistent express warranties. Where there is implied in law a certain duty to persons not in contract privity, it seems preposterous that the seller should escape that duty by inserting into a non-contractual relationship a contractual disclaimer of which the remote injured person would be unaware .... This warranty imposed by law, irrespective of privity and based on public policy, is more aptly called 'strict liability.'"

237 F.Supp. at 431 (citations omitted). Finally, the court stated: "If [section 402A of] the Restatement correctly states the conditions of recovery now in practice, let those elements have a fresh name and abandon the old entanglements of 'warranty.'" *Id.* at 432. Clearly, the court in *Greeno* considered breach of implied warranty in tort and strict liability congruent theories of recovery.

In a Seventh Circuit Court of Appeals case originating under Indiana law, *Dagley v. Armstrong Rubber Co.* (7th Cir.1965), 344 F.2d 245, the administrator of a deceased truck driver's estate sued the manufacturer of a truck tire that allegedly caused the decedent's death when it blew out. There was no privity between the decedent and the defendant-manufacturer, and the district court granted the defendant's motion to dismiss the count of the complaint alleging "breach of implied warranty that the tire would be reasonably fit for use on the highways." *Id.* at 247. In reversing the district court's dismissal of this count, the Seventh Circuit Court of Appeals relied on section 402A as stating a "new concept of warranty." *Id.* at 253.

"The new concept of warranty bases liability on strict liability in tort. This warranty 'is a very different kind of warranty from those usually found in the sale of goods, and * * * it is not subject to the various contract rules which have grown up to surround such sales.' [Quoting RESTATEMENT (SECOND) OF TORTS § 402A comment m (1965).]

The American Law Institute in May, 1964, discussed the following revision to Section 402A of its Restatement (Second), Torts, which revision would adopt this new concept of warranty[.]"

344 F.2d at 253. Thus, the court in *Dagley* clearly equated the plaintiff's action for personal injury for breach of implied warranty absent privity with a section 402A action.

The District Court for the Southern District of Indiana, in *Withers v. Sterling Drug, Inc.*, (S.D.Ind.1970), 319 F.Supp. 878, was even more explicit and stated, for the first time, albeit in dicta, the proposition that an action for breach of implied warranty sounding in tort is duplicitous of an action for strict liability in tort under section 402A. In *Withers*, the plaintiff sued the defendant-manufacturer of a drug, with whom the plaintiff was not in privity of contract, for damage to her eyes allegedly caused by the drug. The district court granted the defendant-manufacturer's motion for summary judgment on the plaintiff's counts for negligence, strict liability and breach of implied warranty, which the plaintiff declared was a contract theory. The court found the negligence and strict liability counts barred by the statute of limitations. The breach of warranty count was held barred by the absence of privity between the plaintiff and the defendant-drug manufacturer if the action was based on contract as the plaintiff declared it was. The district court went on, however, to discuss the case in terms of the alternative theory of breach of warranty sounding in tort. After reviewing the Seventh Circuit Court's decision in *Dagley v. Armstrong Rubber Co., supra,* and the "new concept of warranty" addressed therein, the court in *Withers* stated:

"Subsequent to the *Dagley* decision, the Appellate Court of Indiana expressly adopted the 'new' warranty concept as it

is embodied in § 402A, Restatement of Torts, 2d (1964). See *Cornette v. Searjeant Metal Products, Inc.*, [147 Ind. App. 46] 258 N.E.2d 652, 21 Ind.Dec. 355 (App.Ct., filed May 26, 1970) and *Perfection Paint & Color Co. v. Konduris,* [147 Ind.App. 106] 258 N.E.2d 681, 21 Ind.Dec. 475 (App.Ct., filed June 2, 1970).

The complaint in this products liability case contains separate counts alleging strict liability and breach of implied warranty. Tortious breach of implied warranty forms the theoretical basis for the strict liability rule adopted in Indiana and does not constitute a separate cause of action. The implied warranty count in the present cause, absent the element of contractual privity, must sound in tort and is, therefore, duplicitous of the strict liability count: It seeks the same remedy under a different label."

319 F.Supp. at 883. Thus, the plaintiff's breach of implied warranty count, had it sounded in tort, would have been barred by the statute of limitations as the strict liability count under section 402A was.

The Indiana Court of Appeals decision that adopted section 402A as the law of this state also relied on *Dagley v. Armstrong Rubber Co., supra,* in equating the theory of breach of implied warranty in tort with the theory of strict liability found in section 402A. In *Cornette v. Searjeant Metal Products, Inc.* (1970), 147 Ind.App. 46, 258 N.E.2d 652, the plaintiff sued the remote manufacturer of a machine, which allegedly injured the plaintiff, on the theory of strict liability in tort. This court accepted section 402A as the law of this state, but held the plaintiff failed to establish a prima facia case under that theory. Judge Hoffman's opinion quoted *Dagley* on the distinction between traditional UCC-type warranties and "the new concept of warranty" based on strict liability in tort— i.e. section 402A. Judge Hoffman then stated:

It should be pointed out, however, that strict liability under § 402A, *supra,* is not the same as liability for breach of the warranty of fitness or merchantability. "Warranty" as used by Judge Hastings

[in *Dagley v. Armstrong Rubber Co.*] and in this opinion is intended in the broad sense of the word and is intended only to identify by analogy the conceptual basis of liability. It should not be confused in this context with the express and implied contract warranties as they may relate to products liability.

147 Ind.App. at 51, 258 N.E.2d at 655–56 (opinion of Hoffman, J.). Judge Hoffman also referred to the "warranty in tort concept of § 402A," *id.* at 52, 258 N.E.2d at 656, further indicating the identity of the two theories.

Judge Sharp's plurality opinion in *Cornette,* in which Judge Pfaff concurred, quoted *Greeno v. Clark Equipment Co., supra,* for the proposition that the liability imposed by section 402A is "hardly more" than the liability imposed under the theory of implied warranty when stripped of its contract doctrines of privity, etc. 147 Ind. App. at 57, 258 N.E.2d at 658 (opinion of Sharp, J., with Pfaff, J. concurring). Thus, in *Cornette v. Searjeant Metal Products, Inc.,* the decision in which strict liability in tort under section 402A was adopted as the law of this state, all three of the judges who expressed an opinion on the nature of section 402A liability equated the theory of strict liability with the theory of breach of implied warranty sounding in tort.

In *Fruehauf Trailer Division v. Thornton* (1977), 174 Ind.App. 1, 366 N.E.2d 21, a truck driver sued a tire manufacturer, with whom the plaintiff was not, apparently, in privity of contract, for personal injury suffered when the tire on the truck he was driving blew out, causing the truck to overturn and burn. The defendant-manufacturer appealed a jury verdict entered for the plaintiff, alleging among other things, that the trial court erred in instructing the jury on both the theory of strict liability in tort and the theory of breach of implied warranty sounding in tort because the two theories were duplicitous and instructing the jury on both theories was prejudicial to the defense. The court in *Fruehauf* agreed that the theories were duplicitous, citing

*Withers v. Sterling Drug, Inc., supra,* but held the trial court's error in instructing the jury on both theories not prejudicial to the defendant-manufacturer, stating: "While implied warranty in tort has been superseded by strict liability, the two theories nonetheless remain closely related. An identical quantum of evidence would be required to support either action in this case. We have already determined that such a preponderance of evidence is present in the trial record." 174 Ind.App. at 9, 366 N.E.2d at 28.

There have been numerous other Indiana cases that have stated or implied that a cause of action of breach of implied warranty in tort and one for strict liability in tort under section 402A, as adopted in Indiana, are duplicitous. *See Whittaker v. Federal Cartridge Corp.* (1984), Ind.App., 466 N.E.2d 480, 481 n. 2; *Lane v. Barringer* (1980), Ind.App., 407 N.E.2d 1173, 1175 ("Clearly, privity of contract is no longer required if a personal injury action for a defective product sounds in tort; either on a negligence theory or on the theory of strict liability in tort."); *Ortho Pharmaceutical Corp. v. Chapman* (1979), 180 Ind.App. 33, 47, 388 N.E.2d 541, 551 ("Numerous courts have found no practical difference between the theories of strict liability under § 402A and breach of implied warranty where the absence of proper warning is the issue."); *see also Corbin v. Coleco Industries, Inc.* (7th Cir.1984), 748 F.2d 411, 416 ("We are inclined to think, though we do not hold, that in the context of products liability actions 'breach of implied warranty sounding in tort,' when not based on the consequential damages provisions of UCC § 26-1-2-715(2)(B), is just another name for strict liability."); *Neofes v. Robertshaw Controls Co.* (S.D.Ind.1976), 409 F.Supp. 1376, 1379.

In contrast to the array of cases cited thus far in this section of this opinion is *Midway Ford Truck Center, Inc. v. Gilmore* (1981), Ind.App., 415 N.E.2d 134. There, a truck driver sued the seller of a truck, purchased by the plaintiff's employer, on the theories of negligence, breach of implied warranty and strict liability. It is not clear from the *Midway* opinion that the breach of implied warranty count sounded in tort, but inasmuch as the plaintiff and defendant-seller were not in privity of contract, we may assume the count was in tort. *See Withers v. Sterling Drug, Inc., supra.* Before trial, the plaintiff and defendant-seller filed a stipulation of dismissal with prejudice of the negligence and breach of implied warranty counts. At trial, however, the plaintiff moved to amend the complaint to conform to the evidence, which the trial court granted, *see* T.R. 15(B), with the result that the previously dismissed negligence and breach of implied warranty counts were, in effect, reinstated. At the close of the plaintiff's evidence, the trial court granted the defendant-seller's motion for judgment on the evidence as to the strict liability count, but allowed the negligence and warranty counts to go to the jury. The jury returned a verdict for the plaintiff, and the defendant-seller appealed, alleging the trial court erred in granting the plaintiff's motion to amend the complaint to conform to the evidence when the effect thereof was to reinstate theories of recovery the plaintiff had previously stipulated to have been dismissed with prejudice. The court in *Midway* agreed with the defendant-seller's argument on appeal, and, moreover, determined the trial court's error was not harmless, stating:

"We agree with Midway that the court's proffered remedy of recalling Gilmore's witnesses for cross-examination on the amended theories would not be a satisfactory method of curing the defects with regard to *voir dire* and preliminary instructions defining the issues of the case which must be considered a substantial part of Midway's defense. We would point out that there are important and substantial distinctions under strict liability, negligence, and breach of warranty theories especially in the area of defenses. (*See, Survey of Recent Developments in Indiana Law—Products Liability,* 12 Ind.L.Rev. 227 (1979) and Ind. Code 33–1–1.5–1 which expressly states

that chapter 1.5 shall govern all products liability cases in which the theory of liability is negligence or strict liability in tort, but shall not apply to actions based upon breach of warranty.)"

415 N.E.2d at 138; *see also id.* at 139 (Young, J. dissenting) ("While I recognize important distinctions in the theories of strict liability, negligence, and breach of implied warranties, I believe a continuance and a recall of witnesses would cure any prejudice.")

Standing alone and in context, the statement in *Midway* that "there are important and substantial distinctions under strict liability ... and breach of warranty theories" is not nearly sufficient authority to counterbalance the array of cases that state or imply that the theories are duplicitous. *Midway* is significant, however, because it raises the issue of the effect of section 1 of the Product Liability Act, IND.CODE § 33–1–1.5–1 to –8 (1982).[7]

The array of cases discussed earlier in this section of our opinion were either decided prior to the passage of the original Product Liability Act in 1978 or failed to discuss or consider the effect of the Act on the cases that have deemed the theories of strict liability in tort and breach of implied warranty in tort as duplicitous. We now turn to a consideration of that effect, if any.

Section 1 of the 1978 Product Liability Act stated:

"Sec. 1. This chapter [IC 33–1–1.5] shall govern all products liability actions, including those in which the theory of liability is negligence or strict liability in tort; provided however, that this chapter does not apply to actions arising from or based upon any alleged breach of warranty."

IC 33–1–1.5–1 (1982). The issue raised by this section in the context of the present case was aptly stated in a law review article that appeared near the time of the passage of the original Act:

"Unresolved by the statute ... is the status of another judicial theory which has evolved in Indiana as a hybrid of tort and warranty. Under this theory claims for personal injury and property damage from defective products under breach of warranty can be characterized to sound in tort. In such actions, the usual UCC contract defenses of notice, disclaimer, limitation of remedy, privity limitations, and the four-years-from-date-of-sale statute of limitation are no longer applicable. The resulting action is so similar to the one brought under strict liability in tort that both are virtually congruent under the case law. But ... the new products chapter departs significantly in a number of areas from the developed Indiana products liability common law. The question remains whether these new provisions are to govern 'tort-warranties,' or whether the warranty action exclusion in section 1 will continue to permit plaintiffs to bring actions with elements similar to 'old 402A' under the warranty-sounding-in-tort theory. Although the latter result would appear inconsistent, the legislature could easily have clarified its intent by stating that the chapter was to exclude warranty actions *under the UCC.* Its failure to do so would seem to make the issue litigable."

Vargo & Lieberman, *Products Liability-1979 Survey of Recent Developments in Indiana Law,* 12 IND.L.REV. 227, 241 (1979) (footnotes omitted).

Section 3 of the 1978 Product Liability Act stated:

"Sec. 3. Codification and Restatement of Strict Liability in Tort. *The common law of this state with respect to strict liability in tort is codified and restated as follows:*

(a) One who sells any product in a defective condition unreasonably dangerous to any user or consumer or to his property is subject to liability for physical harm thereby caused to the user or

---

7. Amended by Act of Apr. 21, 1983, Pub.L. No. 297–1983, 1983 Ind. Acts 1814 (codified at IND.CODE §§ 33–1–1.5–1 to –5 (Supp.1985) (effective Sept. 1, 1983). The 1982 version of the Act applies to this case, which accrued in 1981.

consumer or to his property if that user or consumer is in the class of persons that the seller should reasonably foresee as being subject to the harm caused by the defective condition, and, if:

(1) the seller is engaged in the business of selling such a product, and

(2) the product is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(b) The rule stated in Subsection (a) applies although

(1) the seller has exercised all possible care in the preparation and sale of his product, and

(2) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

IC 33–1–1.5–3 (1982) (emphasis added). The emphasized language of Section 3 above indicates it was the legislature's intent in passing the Product Liability Act to codify and restate "the common law of this state with respect to strict liability in tort." As cases discussed earlier in this opinion make clear, that common law was based on the adoption of section 402A of the Restatement (Second) of Torts as the rule of strict liability in Indiana. *See Cornette v. Searjeant Metal Products, Inc., supra.* It appears that the common law of this state before 1978 was that the theory of breach of "implied warranty in tort [had] been superseded by strict liability" as stated in section 402A. *Fruehauf Trailer Division v. Thornton,* 174 Ind.App. at 9, 366 N.E.2d at 28; *see Cornette v. Searjeant Metal Products, Inc., supra* (opinions of Hoffman, J., and Sharp, J.) (equating the theory of breach of implied warranty in tort with the theory of strict liability under section 402A).

We note that the language of section 3 of the 1978 Product Liability Act is virtually identical to the language of section 402A of the Restatement (Second) of Torts (1965), *see supra* note 6, with the exception that section 3 limits the seller's liability to the class of users or consumers that "the seller should reasonably foresee as being subject

to the harm caused by that defective condition" IC 33–1–1.5–3 (1982). This exception would not seem to create any important distinction between section 3 of the Act and the theory of breach of implied warranty in tort. It would seem reasonable to conclude, therefore, that by codifying and restating the "common law of this state with respect to strict liability in tort" in terms virtually identical to the terms of section 402A, which the courts of this state had held to supersede the theory of breach of implied warranty in tort, the legislature intended that section 3 of the 1978 Product Liability Act also supersede that theory.

What meaning is to be given, then, to the provision in section 1 of the Act that it "does not apply to actions arising from or based upon any alleged breach of warranty?" IC 33–1–1.5–1 (1982). We note first of all that section 1 explicitly *does* apply to "all products liability actions . . . in which the theory of liability is . . . strict liability in tort." *Id.* We note also that the theory of tortious breach of implied warranty is a theory of strict liability in tort. *See Fruehauf Trailer Division v. Thornton,* 174 Ind.App. at 8, 366 N.E.2d at 28 ("[T]he term 'strict liability' signifies the standard of culpability to which a seller will held for breach of an implied warranty which is imposed, as a matter of public policy, to a product he sells.") *See also Greeno v. Clark Equipment Co.,* 237 F.Supp. at 431 ("This warranty imposed by law, irrespective of privity and based on public policy, is more aptly called 'strict liability.'") Thus, it appears that the theory of breach of implied warranty in tort is a theory of strict liability in tort to which the Product Liability Act was meant to apply, according to Section 1 of the Act. Although the legislature might have been more clear in expressing its intent, we believe the breach of warranty actions to which the Act does not apply, by the terms of Section 1, are those brought under the UCC, which are not strict liability actions because they require the privity of contract found in a transaction between buyer and seller. *See* IC 26–1–2–314 (implied warran-

ty of merchantability); *id.* § 2–315 (implied warranty of fitness for particular purpose). Any other result would be inconsistent with the legislature's intent, stated in section 3 of the 1978 Product Liability Act, to codify and restate "the common law of this state with respect to strict liability in tort." IC 33–1–1.5–3 (1982); *see Vargo & Liebman, supra.*

■■■■ Therefore, we conclude that the 1978 Product Liability Act is, as it purports to be, a codification of the pre-Act common law of the theory of strict liability in tort which held the theories of breach of implied warranty in tort and strict liability in tort in section 402A of the Restatement (Second) of Torts to be identical. Thus, the 1978 Act did not do anything to change the identity of the theories.[8]

In conclusion, there is a vast array of Indiana authority in support of the proposition that the theory of breach of implied warranty in tort is identical to the theory of strict liability in tort as originally adopted in this state under section 402A of the Restatement (Second) of Torts and as codified in the Product Liability Act, IC 33–1–1.5–1 to –8 (1982). We have discovered no case or other authority that persuasively distinguishes the elements of the two theories; to the contrary, two Indiana cases state that, under the given facts of each case, the elements are indistinguishable. *See Corbin v. Coleco Industries, Inc., supra; Fruehauf Trailer Division v. Thornton, supra; see also* WHITE & SUMMER, HANDBOOK OF THE LAW UNDER THE UNIFORM COMMERCIAL CODE § 9–7 at 355 (2d ed.). We can conceive of no set of facts under which it would be possible for an injured plaintiff to recover for personal injury on the theory of breach of implied warranty in tort but not on the theory of strict liability in tort.

■■■■ Therefore, we hold the trial court properly granted Faygo summary judgment on Count II of the Thieles' complaint, based on breach of implied warranty in tort, because that count duplicates and merges with Count IV .of the complaint based on strict liability in tort. Because Count III, based on the federal Magnuson-Moss Act, *see* 15 U.S.C. § 2301 to 2312, depends upon a finding of a breach of warranty and such a finding is precluded in this case, we also hold the trial court correctly granted Faygo summary judgment on Count III of the complaint.

### Strict Liability in Tort

The Thieles finally allege the trial court erred in granting Faygo summary judgment on Count IV of their complaint, claiming Faygo failed to meet its burden of demonstrating there was no genuine issue of material fact as to the Thieles' claim of strict liability in tort. *See McCullough v. Allen* (1983), Ind.App., 449 N.E.2d 1168. Faygo claims summary judgment in its favor was appropriate because the Thieles failed to present any proof that the product—the case of Faygo pop—was defective at the time it left Faygo's control. *See Gilbert v. Stone City Construction Co.* (1976), 171 Ind.App. 418, 357 N.E.2d 738.

■■■■ The Thieles have alleged the design of Faygo's product rendered it defective and unreasonably dangerous under Indiana Code section 33–1–1.5–3 (1982). They claim the design of the case of Faygo pop—utilizing a tight plastic wrapper around a flexible cardboard container—caused a sharp piece of glass to be catapulted from the top of the case into Robert Thiele's eye. Robert Thiele's deposition indicates that cases of Faygo pop left Faygo's control when they were removed from Faygo trucks at the Kroger Company warehouse docks. The cases were moved

---

8. The 1983 Amendment to the Product Liability Act does not alter our conclusion. As amended, section 1 of the Act now reads: "Sec. 1. Except as provided in section 5 of this chapter, this chapter governs all actions in which the theory of liability is strict liability in tort." IC 33–1–1.5–1 (Supp.1985). Thus, the language of section 1 of the original Act that declared its inapplicability to actions based on "any alleged breach of warranty" has been removed from section 1 of the Act as amended. We believe the amendment clarifies, rather than alters, the result we reach above.

within an hour from the dock to the warehouse, where they remained for up to one month until picked by a grocery order worker, such as Robert, for shipment to a Kroger retail store. We see nothing in this evidence to indicate that the alleged defect—the design of the case of Faygo pop—could have changed while the product was in the Kroger warehouse. Thus, if the product was in "a defective condition unreasonably dangerous," IC 33–1–1.5–3, at the time of Robert's injury, it must have been so when it left Faygo's control. Whether a product is in a defective condition unreasonably dangerous is generally a question for the trier of fact. *Corbin v. Coleco Industries, Inc.* (7th Cir.1984), 748 F.2d 411, 419.

Nevertheless, we must affirm the trial court's grant of summary judgment to Faygo on the strict liability count of the complaint on other grounds, which were not addressed in the appellate briefs of either party.

"Although normally we will not decide the merits of an appeal upon grounds not argued by the parties, nor submitted to the trial court, we are obligated to ascertain the correct law applicable to the facts if to do otherwise would be to render a clearly erroneous appellate decision.

As stated in *Allied Structural Steel Co. v. State* (1970) 148 Ind.App. 283, 265 N.E.2d 49, 57:

'In this connection, we feel bound to state that once the merits of an appeal are reached, it is the solemn obligation of this court to determine the law which controls the decision, whether or not counsel for one or both parties adequately perform his or their appellate duties.' *See also Lee v. Estate of Cain* (1985) 3d Dist. Ind.App., 476 N.E.2d 922; *Four Winns, Inc. v. Cincinnati Insurance Co.* (1984) 3d Dist. Ind.App., 471 N.E.2d 1187; *McEntire v. Indiana National Bank* (1984) 4th Dist. Ind.App. 471 N.E.2d 1216."

*Ayres v. Indian Heights Volunteer Fire Dept.* (1985), Ind.App., 482 N.E.2d 732, 737–38.

As noted earlier in this opinion, Section 3 of the 1978 Product Liability Act "codified and restated" the common law of strict liability in tort as follows (in relevant part):

"(a) One who sells any product in a defective condition unreasonably dangerous to any user or consumer ... is subject to liability for physical harm thereby caused to the user or consumer ... if that user or consumer is in the class of persons that the seller should reasonably foresee as being subject to the harm caused by the defective condition...."

IC 33–1–1.5–3(a) (1982). Thus, of all potential plaintiffs who might be injured by a defective product, the class of plaintiffs who have been granted the protection of the Product Liability Act has been doubly limited to 1) users and consumers 2) whom the seller should reasonably foresee as being subject to the harm caused by the product's defective condition. The question before us is whether there is any genuine issue of material fact regarding Robert Thiele's inclusion in that protected class of plaintiffs, and if not, whether Faygo is entitled to judgment as a matter of law.

The definitional section of the Act stated:

" 'User or consumer' shall include: a purchaser; any individual who uses or consumes the product; or any other person who, while acting for or on behalf of the injured party, was in possession and control of the product in question."

IC 33–1–1.5–2. There is no factual dispute here regarding Robert's relationship to the product: he was a "middle man" employee at the distribution level of his employer's business who handled Faygo's product as it flowed through the stream of commerce toward the retail purchaser. The question before us, therefore, is whether such an employee is a "user or consumer" as defined in the Act. This is a pure question of law, requiring only an application of the law to undisputed facts, and it is thus

appropriate for determination on summary judgment. *See* T.R. 56(C).

The only portion of the statutory definition of "user or consumer" that conceivably could include Robert Thiele in the present circumstances is that which includes "any individual who uses ... the product," IC 33–1–1.5–2, because Robert clearly did not purchase or consume the product or possess it while acting on behalf of the injured party. The dictionary defines the transitive verb "use" as follows:

> "1: accustom, habituate, inure 2: to put into action or service: avail oneself of: employ 3: to consume or take (as liquor or drugs) regularly 4: to carry out a purpose or action by means of: utilize 5: to expend or consume by putting to use 6: to behave toward: act with regard to: treat"

WEBSTER'S SEVENTH NEW COLLEGIATE DICTIONARY 978 (1969). None of these definitions accurately characterizes Robert Thiele's handling of Faygo's product at the distribution level of Kroger's business.

■ It appears the legislature intended "user or consumer" to characterize those who might foreseeably be harmed by a product *at or after* the point of its retail sale or equivalent transaction [9] with a member of the consuming public. In *Whittaker v. Federal Cartridge Corp.* (1984), Ind.App., 466 N.E.2d 480, *trans. dismissed,* this court considered the definition of "user or consumer" found in Section 2 of our Product Liability Act for the purpose of determining when the period of limitation for a product liability action commences. *See* IC 33–1–1.5–5. In *Whittaker,* the plaintiff sued the defendants under the Act after she was injured while using a rifle manufactured by defendant Marlin Firearms, which was loaded with ammunition manufactured by defendant Federal Cartridge. We quote at length from that opinion, because it is the only decision to consider the phrase "user or consumer" as defined in the Product Liability Act and

because its discussion of the legislative intent underlying that phrase is applicable to the case before us:

> "IC 33–1–1.5–5 provides in part:
> '[A]ny product liability action must be commenced within two (2) years after the cause of action accrues or within ten (10) years after the delivery of the product to the initial user or consumer.'
>
> ＊ ＊ ＊ ＊ ＊ ＊
>
> The trial court ruled that the ten year statute of limitations began to run when Marlin and Federal delivered the rifle and ammunition to retailers, which is thirty-four years and thirteen years, respectively, before the Whittakers filed their complaint. We disagree with the court's interpretation that the language in IC 33–1–1.5–5, 'within ten (10) years after the delivery of the product to the initial user or consumer,' refers to delivery of the product to any purchaser from the manufacturer regardless of whether that purchaser is a retailer, dealer, or any other intermediary along the chain of distribution.
>
> ＊ ＊ ＊ ＊ ＊ ＊
>
> IC 33–1–1.5–2 provides the following definitions:
> ' "Seller" includes a manufacturer, a wholesaler, a retail dealer or a distributor.
>
> "User or consumer" shall include: a purchaser, any individual who uses or consumes the product; or any other person who, while acting for or on behalf of the injured party, was in possession and control of the product in question.'
>
> Again, IC 33–1–1.5–5 provides in part:
> '[A]ny product liability action must be commenced within two (2) years after the cause of action accrues or within ten (10) years after the delivery of the product to the initial user or consumer.'
>
> The plain meaning of the statute is that the period of limitations commences at the time the product is delivered from

---

9. *See Link v. Sun Oil Co.* (1974), 160 Ind.App. 310, 312 N.E.2d 126; *Perfection Paint & Color Co. v. Konduris* (1970), 147 Ind.App. 106, 258 N.E.2d 681.

the manufacturer, wholesaler, retailer, or distributor to the first consuming entity. It is clear from the statutory language and definitions that the term 'seller', which 'includes a manufacturer, a wholesaler, a retail dealer, or a distributor', and the term 'user or consumer' are mutually exclusive. Marlin and Federal would have us believe, as did the trial court, that the term 'initial user or consumer' in IC 33-1-1.5-5 includes those retailers and other intermediaries. Again, we need only look to the definitions provided in IC 33-1-1.5-2 to dismiss this contention. The term 'seller' encompasses not only manufacturers but also the intermediaries. 'User or consumer' does not.

Indiana's Product Liability statute is a codification of the common law of products liability which had been adopted in this state. *See,* IC 33-1-1.5-3; *Cornette v. Searjeant Metal Products, Inc.,* (1970), 147 Ind.App. 46, 258 N.E.2d 652. The common law was essentially an adoption of the Restatement 2d of Torts Sec. 402A to which an explanatory comment provides in part:

'1. *User or consumer.* In order for the rule stated in this Section to apply, it is not necessary that the ultimate user or consumer have acquired the product directly from the seller, although the rule applies equally if he does so. *He may have acquired it through one or more intermediate dealers.'* (Emphasis added.)

Restatement 2d of Torts Sec. 402A, comment 1. It is clear that the authors of 402A did not contemplate intermediate dealers to be within the scope of the definition of 'user or consumer.'

In *Cornette, supra,* our Court adopted Sec. 402A and quoted from it as follows:

'On whatever theory, the justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products.'

*Cornette, supra,* 258 N.E.2d at 656 *quoting* R.2d Torts Sec. 402A, comment c. This enunciation of the policy behind strict products liability reveals again the juxtaposition in products liability law between the using and consuming public on the one hand, and all those entities who have marketed the product, manufacturers and otherwise, on the other hand.

Marlin and Federal rely primarily for their interpretation of the statute on the inclusion of the work 'purchaser' under the definition 'user or consumer.' They contend that this 'purchaser' refers to any intermediary who purchases the product from the manufacturer, so that the statute of limitations would begin to run upon delivery to that intermediary. Again, our plain reading of the statute and of Indiana common law on products liability prohibits that interpretation. We agree with the Whittakers that the separation of the term 'purchaser' from the phrase 'any individual who uses or consumes the product' in the definition of 'user and consumer' was most likely intended to reflect the breadth of the class of plaintiffs as described in comment 1. to Sec. 402A.

'It is not even necessary that the consumer have purchased the product at all. He may be a member of the family of the final purchaser, or his employee, or a guest at his table, or a mere donee from the purchaser. The liability stated is one in tort, and does not require any contrac-

tual relation, or privity of contract, between the plaintiff and the defendant.' Second Restatement of Torts, Sec. 402A, comment 1. [Footnote omitted]"

*Whittaker v. Federal Cartridge Corp.*, 466 N.E.2d at 481–83.

 Thus, in *Whittaker*, we held that, for purposes of the Product Liability Act's ten-year statute of repose, "user or consumer" means "consuming entity" and does not include wholesalers, retailers or any other intermediary in the chain of distribution. The definition of "user or consumer" found in Section 2 of the Act applies uniformly wherever that phrase is used in the statute. *See* IC 33–1–1.5–2. Because, as the court in *Whittaker* determined, the phrase does not include intermediaries in the distributive chain, we do not believe it was intended to include the employees of such intermediaries, such as Robert Thiele in the present case.

The *Whittaker* court was guided in its decision by comment c. and comment 1. of Section 402A. Also relevant to the present case is comment o., which states in part:

"o. *Injuries to non-users and non-consumers.* Thus far the courts, in applying the rule stated in this Section, have not gone beyond allowing recovery to users and consumers, as those terms are defined in Comment 1. Casual bystanders, and others who may come in contact with the product, as in the case of employees of the retailer, or a passerby injured by an exploding bottle, or a pedestrian hit by an automobile, have been denied recovery. There may be no essential reason why such plaintiffs should not be brought within the scope of the protection afforded, other than that they do not have the same reasons for expecting such protection as the consumer who buys a marketed product; but the social pressure which has been largely responsible for the development of the rule stated has been a consumers' pressure, and there is not the same demand for the protection of casual strangers."

RESTATEMENT (SECOND) OF TORTS Sec. 402A, comment o. (1965). This comment is concerned mainly with the problem of bystander recovery. In 1983, our legislature expanded the definition of "user or consumer" to include "any bystander injured by the product who would reasonably be expected to be in the vicinity of the product during its reasonably expected use." IC 33–1–1.5–2 (Supp.1985).

We note that the rationale behind extending the protection of strict liability theory to bystanders seems equally applicable to the employees of those entities in the distributive chain preceding the sale of a product to the "first consuming entity." Such an employee and such bystander are both foreseeably subject to harm caused by a defective product; neither is able to protect himself from such harm by choosing to deal with only reputably safe products. Thus, it would seem that a person in Robert Thiele's position in the chain of distribution of a product from manufacturer to consuming entity is as deserving of the protection of our Product Liability Act as any bystander. Nevertheless, it appears our legislature has required a "sale" to a "first consuming entity" before the protection afforded by the Act is triggered, and Robert Thiele's injury occurred before such a transaction involving Faygo's product took place.

Because Robert Thiele was not a "user or consumer" of Faygo's product as defined in our product liability statute, he is not entitled to the benefit of the strict liability theory of recovery stated therein. Therefore, the trial court properly granted Faygo summary judgment on Count IV of the Thieles' complaint.

The trial court's judgment granting the defendant, Faygo Beverages, Inc., summary judgment on Counts II, III and IV of the Thieles' complaint is affirmed; the judgment as to Count I is reversed; and the cause is remanded for further proceedings.

YOUNG, P.J., concurs.

CONOVER, J., dissents with separate opinion.

CONOVER, Judge, dissenting.

I respectfully dissent as to the majority's holding the negligence cause of action in this case must be returned for trial. The negligence of Faygo Beverage, Inc. (Faygo), if any, is not actionable in this cause. I do, however, concur in the majority's conclusions (a) the implied warranty in tort causes of action no longer exist in Indiana, and (b) Mr. Thiele is not entitled to pursue Faygo for a defective product under our statute codifying product liability actions.

Under the facts before us, the injury to Mr. Thiele's eye was proximately caused by the broken piece of glass. The question then becomes whether the carton's negligent design which produced the "trampoline effect" complained of was a concurrent or non-actionable remote cause of Thiele's injury.

## I. *Negligent Design*

Staton, P.J., discussing this subject recently said

> In determining whether a negligent act or omission is the proximate cause of an injury the test is whether the injury is a natural and probable consequence which, in light of the circumstances, should reasonably have been foreseen or anticipated. *Havert v. Caldwell* (1983), Ind., 452 N.E.2d 154, 158. The key is the foreseeability of the ultimate injury as a natural and probable consequence of the act or omission. *Id.* A rule related closely to the foreseeability requirement is that an intervening cause may cut off the liability of the original actor. (citing case) ..
>
> For independent intervening conduct to prevent the extension of liability to the conduct of the original wrongdoer, the later conduct must constitute a cause interrupting the natural sequence of events, turning aside their course, preventing the natural and probable result of the original act or omission, and producing a result that could not have been reasonably anticipated. (citing case) It is a well settled principle that when defendant's negligence merely creates a condition by which the subsequent injury-producing acts of another are made

possible, the *existence* of the first condition cannot be the proximate cause of the injury. (citing case) (emphasis in original).

*Crull v. Platt* (1984), Ind.App., 471 N.E.2d 1211, 1214–15. *See, also Havert v. Caldwell* (1983), Ind., 452 N.E.2d 154, 156–158. While the question of whether an intervening cause was such as to break the causal connection between defendant's act and the injury is generally for the trier of fact, in plain and indisputable cases where only a single inference or conclusion can be drawn, such question is a matter of law for the court. *Crull,* 471 N.E.2d at 1215.

Injuries of the general kind Thiele here suffered were not reasonably foreseeable by Faygo's packaging engineers as they were designing the carton in question, in my opinion. While foreseeability does not mean the precise hazard or exact consequences should have been foreseen, "neither does it encompass anything which might conceivably occur." *Crull,* 471 N.E.2d at 1215. Pinched or cut fingers from the carton's bending were reasonably foreseeable at that time, perhaps the stinging or bruising of these extremities by the covering's "trampoline action" when it was flexed, but injuries of the nature Thiele suffered were not reasonably foreseeable as a matter of law during the carton's design stage in my opinion. The negligence of an unidentified independent responsible agency caused the broken piece of glass to be placed on top of the carton's plastic wrapper. Such negligence was the proximate cause of the injury here. It broke the causal connection between Faygo's alleged negligence and Thiele's injury. Faygo's negligent design

> cannot as a matter of law be held to be the proximate cause of the injuries ... due to the unforeseeability of the [unknown responsible independent agency's] subsequent act....

*Havert,* 452 N.E.2d at 159; *Slinkard v. Babb* (1954), 125 Ind.App. 76, 112 N.E.2d 876, 880, reh. den'd. 125 Ind.App. 76, 117 N.E.2d 564, trans. den'd. 233 Ind. 633, 122 N.E.2d 463.

Thiele's negligent design theory fails as a matter of law for those reasons, in my opinion.

For those reasons, I would affirm the trial court in all respects.