Miriam BUTLER, Individually, and as Personal Representative of the Estate of James E. Butler, and Mark Butler, Individually and as a Partially Dependent Child of James E. Butler, Appellant–Plaintiff,

v.

CITY OF PERU and Peru Municipal Utilities, Appellee–Defendants.

No. 52A02–9803–CV–269.

Court of Appeals of Indiana.

July 7, 1999.

Donald J. Tribbett, Starr Austen Tribbett & Myers, Logansport, Indiana, Attorney for Appellant.

Thomas J. Trauring, Fell, McGarvey, Trauring & Wilson, Kokomo, Indiana, Attorney for Appellee.

## OPINION

FRIEDLANDER, Judge

James Butler was employed as a maintenance worker for the Peru Community School Corporation. In September 1993, Butler was killed when he came into contact with a high voltage electrical line while attempting to repair an electrical problem at the baseball field at Peru High School (the School). Miriam Butler and Mark Butler, James's widow and child, respectively, (the Butlers) filed a wrongful death lawsuit against the City of Peru (the City) and Peru Municipal Utilities (PMU). The Butlers appeal from a grant of summary judgment in favor of the City and PMU, presenting the following restated issues for review:

1. Does the Product Liability Act apply when an electrical utility customer's employee is injured on the customer's premises by a defect in an electrical installation that was not performed by the utility?

2. Did PMU have a duty to insulate the high voltage line located on the tower on which James Butler was electrocuted?

3. Does an electrical utility have a duty to protect a customer's employee from a dangerous condition in the electrical work that is located on the customer's property?

4. Did PMU gratuitously assume a duty to protect persons from dangerous conditions in the customer's own electrical work on the customer's premises?

5. Was the plaintiffs' decedent contributorily negligent as a matter of law?

We affirm.

The facts favorable to the nonmoving party are that electrical appurtenances, including light towers and wiring, were installed sometime between 1968 and 1971 for lights around the School's baseball field. In 1968, the Peru Utilities Service Board adopted a resolution to hire an engineering firm, Campbell, De-Boe, Giese & Weber (Campbell, DeBoe) for general engineering services for the City's electrical systems that were authorized by the Board.

In a letter dated June 24, 1968, Campbell, DeBoe informed the School's architect, Fanning & Howey, about some of the agreements that had apparently been reached by the parties concerning school corporation electrical service, including lighting for the new baseball field. According to the letter, the City would furnish and install a primary switch to control flood lighting at the baseball field. The switch was to be installed on the tower designated A–2, which was the site of James Butlers's accidental electrocution in 1993. The letter also stated that the City would furnish and install transformers. One of the transformers was to be installed on tower A–2, along with all primary cable and protective equipment. According to the same letter, the School's contractor was to install all secondary wiring and conduit and also was to install a power center for the concession stand. The School also was responsible for installing a chain link fence around tower A–2. Finally, the School was to hire a contractor who would be responsible for: (1) trenching and back filling for the underground primary electricity; (2) constructing the light towers; and (3) conduit wiring, connections, lighting panels, and the wiring of lamps. PMU hired a contractor to extend electricity cables or lines up each lighting tower approximately twenty-five feet to the lighting, transformer, conduit and pole box. The towers were connected by underground lines, which were brought above ground to connect each tower. At tower A–2, a control wire came down from the high voltage to the primary line disconnect (oil switch), which was accessible at ground level.

A riser pole is a utility pole at the end of PMU's distribution line. Fuses are located on top of the riser poles. Electrical service is established when the fuses are activated. To supply electricity for the School's baseball field, PMU provided electricity from its distribution system to a riser pole located near, but not on, the school's property line east of the baseball field. From the riser pole, electricity passed through lines that were buried underground on school property. The entire electrical system at the baseball field, including everything past the riser pole, was owned, maintained, and controlled by the School. PMU did not have an easement across School property in connection with supplying electricity at the baseball field.

In 1970, Campbell, DeBoe prepared plans for a substation that would provide electrical power to the new high school, the new baseball field, the existing football field, and the existing junior high school. In July, 1970, PMU contracted with T & F Construction Co. of Indiana to install the new substation, which was to be located 1200 feet east of the new high school and 800 feet south of Washington Street. The transformer was mounted on a concrete foundation at that location. This substation was not the site of James Butler's fatal accident.

In a letter dated May 17, 1971, PMU informed the School's architects that the fenced enclosure that had been installed around tower A–2 appeared to be dangerously close to the high voltage equipment that had been installed on the tower. The letter further stated that the electrical connections had to remain as installed and requested that the School change the location of the fence in order to obtain safe clearances. The letter further stated that the circuit would not be energized until the fenced enclosure was modified as requested. Although there is no direct evidence to support it, PMU concedes that it may be inferred that the fence was moved as requested prior to electricity being supplied to the field.

After the field was completed and in use, the School would occasionally install a temporary fence in the outfield. When that occurred, PMU would, at the School's request,

locate the underground electrical lines on the School's property. When the School installed a permanent outfield fence, the contractor inadvertently cut an underground cable. Again at the School's request, PMU repaired the damaged cable, which occurred at a distance from tower A–2. Except for the aforementioned repair, the electrical facilities at the baseball field had never been repaired or modified since the time of installation. At some point in time after the fence was installed around tower A–2, the fence was padlocked shut and the School placed a sign on the fence stating "HIGH VOLTAGE."

In September, 1991, Butler and Charles Enyeart, another maintenance worker for the School, sought to repair a 110–volt electrical outlet near the fence behind home plate at the baseball field. The power source for the outlet was located inside the fenced enclosure around tower A–2. The two men determined that there was no power to the outlet. Butler, who was knowledgeable about electricity, discussed with Enyeart the possibility of calling PMU for assistance but decided against the idea. Butler decided to check the power supply to other wiring within the padlocked area. He unlocked the gate, went into the enclosure, and climbed onto the first cross member of tower A–2 with a pocket tester rated at 600 volts. While standing on the cross member approximately three feet off of the ground, Butler was electrocuted.

The appellants filed a wrongful death lawsuit against Peru and PMU. PMU denied the allegations in the complaint and filed a summary judgment motion. Following a hearing, the trial court granted summary judgment in favor of the City and PMU. All of the issues presented by the Butlers address the grant of summary judgment in favor of PMU. No issue is presented with respect to the grant of summary judgment in favor of the City.

■■■ Our standard of review when considering the grant or denial of a summary judgment motion is well settled. The trial court's grant of summary judgment is clothed with a presumption of validity and the appellant bears the burden of proving that the trial court erred. When reviewing a motion for summary judgment, this court applies the same standard utilized by the trial court, and we resolve any doubt as to a fact, or an inference to be drawn therefrom, in favor of the party opposing summary judgment. We will affirm a trial court's grant of summary judgment if it is sustainable on any theory found in the evidence designated to the trial court. . . . [O]ur inquiry remains whether a genuine issue of material fact exists which requires a trial on the merits. *Bamberger & Feibleman v. Indianapolis Power & Light Co.,* 665 N.E.2d 933, 936 (Ind.App.1996) (citations omitted).

1.

■■■ We must first determine whether the trial court was correct in determining that the Products Liability Act (the Act) does not apply in this case.

■■■ We note initially that Indiana recognizes that electricity can be a "product" within the meaning of the Act. *See Public Serv. Indiana, Inc. v. Nichols,* 494 N.E.2d 349 (Ind.Ct.App.1986). However, the trial court determined that the Act does not apply in the instant case because James Butler was not a "consumer" within the meaning of the Act. Determining whether a plaintiff is a consumer within the meaning of the Act is a pure question of law and is therefore appropriate for determination on summary judgment. *Thiele v. Faygo Beverage, Inc.,* 489 N.E.2d 562 (Ind.Ct.App.1986), *trans. denied.*

According to the Act, of all of the potential plaintiffs who might be injured by a defective product, those that have been granted the protection of the Act has been doubly limited to (1) users and consumers (2) whom the seller should reasonably foresee as being subject to the harm caused by the product's defective condition. *Thiele v. Faygo Beverage,Inc.,* 489 N.E.2d 562. We must decide whether the trial court was correct in determining that there is no issue of material fact concerning James Butler's inclusion in the protected class of plaintiffs.

The statutory definitions of "consumer" into which James Butler must fit include the following:

(1) a purchaser;

(2) any individual who uses or consumes the product;

(3) any other person who, while acting for or on behalf of the injured party, was in possession and control of the product in question; or

(4) any bystander injured by the product who would reasonably be expected to be in the vicinity of the product during its reasonably expected use.

Ind.Code Ann. § 34–6–2–29 (West Supp. 1999). James was not a purchaser of the product, nor did he consume the product or possess it while acting on behalf of an injured party. On the facts of this case, he was not a bystander. Therefore, the only definition of "consumer" that could conceivably apply to James is "any individual who ... uses the product." In *Thiele v. Faygo Beverage, Inc.*, 489 N.E.2d 562, the court concluded that "use" in this context has six possible meanings: (1) accustom, habituate, or inure; (2) to put into action or service, to avail oneself of, or employ; (3) to consume or take regularly; (4) to utilize, to carry out a purpose or action by means of; (5) to expend or consume by putting to use; or (6) to behave toward or act with regard to. The court further clarified the class of plaintiffs that the Act was designed to protect when it observed, "It appears the legislature intended 'user or consumer' to characterize those who might foreseeably be harmed by a product *at or after* the point of its retail sale or equivalent transaction with a member of the consuming public." *Id* at 586 (emphasis in original).

We conclude, as did the *Thiele* court about the injured party in that case, that none of the aforementioned definitions accurately characterizes James Butler's handling of PMU's product at the distribution level. The trial court did not err in concluding that the Act does not apply in this action.

2.

■ The Butlers contend that PMU had a duty to insulate the high voltage line on tower A–2.

. ■ An electrical utility is required to insulate high voltage power lines if they are owned by the utility and are located in an area where the general public may into contact with them. *Jones v. City of Logansport*, 436 N.E.2d 1138 (Ind.Ct.App.1982). With regard to the first element necessary to impose a duty, *i.e.*, ownership of the line, it is undisputed that the School owned the power line that electrocuted James Butler. Regarding the second element, *i.e.*, a location accessible to the public:

The term "general public" in this sense means those persons who could reasonably be anticipated to be dangerously close to the lines, as was stated in *Jakob v. Gary Railways, Inc.* (1947), 118 Ind.App. 13, 70 N.E.2d 753:

"The word 'public,' as used in the statute, means the general public[,] a great multitude of persons who would, in the course of daily events, be exposed to danger by the presence of an uninsulated wire carrying a dangerous voltage of electricity. The word has no reference to an individual whose particular employment requires him to work in the proximity of a live wire with which there would be no likelihood of his coming in contact except for such employment. The exposure must be common to the concourse of people who make up the general public in any locality." 70 N.E.2d at 754.

*Southern Indiana Gas & Elec. Co. v. Steinmetz*, 377 N.E.2d 1381, 1383–84, 177 Ind.App. 96 (1977) (some citations omitted). The high voltage line in question was located within a fenced area that was padlocked shut. The key to the padlock was owned by the School, not PMU. James Butler was in close proximity to the live wire at the time of his death by virtue of his employment with the School. Under these facts, PMU did not owe a duty to insulate the high voltage line located inside the fenced area on tower A–2.

3.

■ The Butlers contend that the trial court erred in concluding as a matter of law that PMU did not have a legal duty to protect James Butler from the dangerous condition located inside the protective fencing around tower A–2.

In order to prevail in their negligence action, the Butlers were required to establish the existence of a duty on PMU's part to conform its conduct to a standard of care arising from its relationship with the plaintiffs, a failure to conform its conduct to that standard of care, and an injury proximately caused by the breach of that duty. *Downs v. Panhandle Eastern Pipeline Co.*, 694 N.E.2d 1198 (Ind.Ct.App.1998), *trans. denied.* The question of whether a duty exists is a question of law for the court to decide. *Id.*

Much of the law relevant to the instant case was set out in *Northern Indiana Pub. Serv. Co. v. East Chicago Sanitary Dist.*, 590 N.E.2d 1067 (Ind.Ct.App.1992) (*ECSD* ). In that case, two carpenters employed by a general contractor were injured when a crane came into contact with an electrical line where they were working on the site of a waste water treatment plant renovation project. The men sued several parties, including the electrical utility company, Northern Indiana Public Service Company (NIPSCO). The court noted that the general rule in Indiana governing electrical utilities is as follows:

> [C]ompanies engaged in the generation and distribution of electricity have a duty to exercise reasonable care to keep distribution and transmission lines safely insulated in places where the general public may come into contact with them.

> [An] electrical utility will not generally be required to insulate its wires with a covering or coating to protect only those persons who might come into contact with power lines in the course of their employment as electrical utility employees, or while cleaning and repairing a sign near power lines, or while installing a TV antenna on private property.

*Id.* at 1072 (quoting *Brown v. Northern Indiana Pub. Serv. Co.*, 496 N.E.2d 794, 797 (Ind.Ct.App.1986), *trans. denied* (citations omitted)). The *ECSD* court applied the aforementioned rule and determined that NIPSCO did not owe a duty to the employees of the general contractor who were injured while on the job. We discern no relevant difference between the carpenters in *ECSD* and James Butler, a maintenance employee for the School, in the instant case. All were employees who were working when they were injured and were working for someone other than the electrical utility. Therefore, PMU did not owe a duty pursuant to the general rule articulated in *ECSD.*

The Butlers contend that an exception to the general rule that was recognized in *ECSD* indicates that a duty existed in the instant case. The exception exists when "the utility knows or has knowledge of such facts [from] which it should know that a particular segment of the population will be regularly exposed to uninsulated lines for one reason or another, particularly when children are involved." *Id.* at 1072 (quoting *Brown*, 496 N.E.2d at 797). In responding to this same argument in *ECSD,* the court noted that the rules announced in *Brown* and similar cases involved situations in which the utility company owned the power lines involved. In the instant case, the Butlers acknowledge that the School, not PMU, owned the electrical connection that electrocuted James Butler. Thus, PMU did not owe a duty to James Butler based upon ownership of the electrical line in question.

The *ECSD* court identified yet another basis for finding a duty owed by an electric company. The court recognized that an electrical utility may in some instances have a duty to protect members of the public from a dangerous condition even when the utility does not own the line on which the condition is located. The court noted that liability may be based upon the electric utility's "actual knowledge of the imminent danger caused by defects in the wiring." *Id.* at 1073. In order to address the issue of duty under this theory, the Butlers were required to designate materials demonstrating or permitting a reasonable inference that PMU had actual knowledge or notice of the circumstances that created an imminent danger to James Butler on September 23, 1993. It is clear from the court's discussion of this exception in *ECSD* that in order to prove the requisite "actual knowledge", the Butlers must set forth facts tending to demonstrate or permit a reasonable inference that PMU had specific knowledge of the particularized details of the injury-producing occurrence. The *ECSD*

court deemed inadequate the plaintiffs' attempt to satisfy this burden by proving general awareness:

> Kelley and Kruger argue that the depositions of NIPSCO employees show that they were aware of construction activity, and therefore NIPSCO had a duty to protect them from electrical injury. Mere knowledge of construction activity is not enough. They have not shown that any NIPSCO employee knew or was on notice of crane activity near the power line on September 15, 1987.

*Id.* at 1074 n. 2.

Applying this principle in the instant case, the Butlers acknowledge that PMU was not notified about the problem with the malfunctioning 110–volt outlet behind home plate. It is certainly undisputed that PMU was unaware that Butler was going to enter into the locked, fenced area and climb onto tower A–2 in an attempt to remedy the problem. Accordingly, the Butlers have not designated materials sufficient to meet their burden of demonstrating that a question of fact exists regarding whether PMU had actual knowledge of the circumstances that led to James Butler's death. Lacking such actual knowledge, no duty arises under this theory.

The trial court did not err in granting summary judgment in favor of PMU on the question of duty under the aforementioned theories.

### 4.

In spite of the facts that PMU did not install the electrical line that fatally injured James Butler and the line was not owned by PMU or located on PMU property, the Butlers contend that PMU nevertheless had a duty to protect James Butler from the dangerous condition existing thereon pursuant to the doctrine of gratuitous assumption of duty. The Butlers contend that PMU gratuitously assumed a duty to protect members of the public from the condition that resulted in James Butler's death.

The *ECSD* court explained the doctrine of gratuitous assumption of duty as follows:

> [A] duty may be imposed upon one who by affirmative conduct ... assumes to act,

even gratuitously, for another to exercise care and skill in what he has undertaken. It is apparent that the actor must specifically undertake to perform the task he is charged with having performed negligently, for without the actual assumption of the undertaking there can be no correlative legal duty to perform the undertaking carefully.

*Id.* at 1074 (quoting *Lather v. Berg,* 519 N.E.2d 755, 766 (Ind.Ct.App.1988)). The question of whether a party gratuitously assumed a duty is generally, but not always, a question for the fact finder. *Johnson v. Owens,* 639 N.E.2d 1016 (Ind.Ct.App.1994), *trans. denied.* To have assumed a duty concerning the safety of school maintenance personnel when working on school property, PMU must have actually undertaken to perform for others this legal duty itself. *See ECSD.*

In order to prevail, it was incumbent upon the Butlers to present evidence that PMU actively undertook the School's duty to provide a safe workplace. In an attempt to meet this burden, the Butlers presented evidence that PMU had previously located underground power lines for the School on occasions when the School was going to erect a temporary outfield fence. On another occasion, when the School was installing a permanent outfield fence, an underground line was inadvertently cut by a contractor and PMU repaired the damage. On all of these occasions, PMU performed the indicated services only after the School requested that it do so. Such is not sufficient to support the conclusion that PMU gratuitously assumed a duty to provide a safe workplace for James Butler.

The Butlers also argue that PMU gratuitously assumed a duty because Harry Beard, a former PMU service employee, testified during a deposition that PMU would not supply electricity to a customer's system if that system did not meet PMU's specifications. Beard's testimony with regard to PMU's practices was too general in nature to impose a duty under the theory of gratuitous assumption of duty because he testified only about PMU's *general* practices when confronted with certain hypothetical cases. He

did not testify that PMU *specifically* undertook the task of making it safe for people to climb onto tower A–2.

In a related matter, the Butlers offered an undated, unsigned letter to the School's architects, stating:

> On a field trip to the New Peru High School site last week, it was brought to our attention, by the city electrical contractor, that the fence enclosure installed around the baseball field lighting tower A–2 appeared to be [too] close to the high voltage equipment he had installed on the tower. Upon inspection we found that the fence was installed extremely close to the tower and placed the high voltage connections dangerously close to the fence for personnel protection. It appears that it would be relatively easy for a school child to climb the fence, reach through the barbed wire and touch the high voltage connection at the transformer.
>
> Due to the design of the lighting tower, the electrical equipment must remain at its present elevation to maintain necessary electrical clearances. Therefore, a change in the fence location to obtain safe clearances for personnel must be considered. Enclosed is a sketch showing our idea on the type of fence installation required.
>
> We must inform you that the circuit to the baseball field lighting will *not* be energized until the fence enclosure modifications have been [resolved?].

*Record* at 131 (emphasis in original). Even assuming for the sake of argument that the letter was authentic, delivered, and acted upon, it is not sufficient to create a question as to whether PMU gratuitously assumed a duty to act in the instant case. PMU's concern about the location of the fence centered upon the accessibility that the fence provided to the high voltage connection on the tower. Apparently, the high voltage connection was several feet above the ground and could be touched by a child who had climbed the fence and was standing atop it. Whether as a result of the above-quoted letter or for another reason, the fence was moved far enough to eliminate the particular danger about which the party that sent the letter was concerned. We observe also that the author of the letter did not dictate terms to the School. That is, the School was not *ordered* to move the fence. Rather, the School was informed that it should *consider* moving the fence. Although we are not unaware of the coercive influence of the sender's pledge to withhold electrical service to tower A–2 until the safety fence was moved, the fact remains that the letter does not evince authority over the project.

In summary, the letter does not reflect that the sender gratuitously assumed the duty to insure the safety of all School employees with regard to any and all facets of the electrical system at the baseball field. To the extent the letter reflects a gratuitous assumption of duty at all, it was the narrow duty to prevent persons outside the fence from being able to touch the high voltage connection that was located inside the fence. James Butler was not electrocuted in the manner that prompted the sender of the letter to express its concern. Rather, Butler, a school employee, opened a padlocked gate on the School's property with a key provided by the School, climbed onto tower A–2, and thereafter came into contact with the high voltage connection.

The same can be said with regard to depositions of other retired PMU employees that were designated by the Butlers in opposition to PMU's summary judgment motion. Generally speaking, the other linemen testified that if they discovered a dangerous condition in a customer's electrical system, they would inform the customer about the problem. Even if this reflected a PMU policy, such was not sufficient to support an inference that utility companies gratuitously assume the duty to discover dangerous conditions in all customers' electrical systems and warn them of all such defects. In summary, the allegedly defective condition was located on a light tower on school property. The tower was constructed by the School's contractor and maintained by the School. At the time of James Butler's death, the tower was in essentially the same condition as when it was constructed. PMU had never inspected or repaired the tower since its construction, nor had it been asked to do so. Finally, James Butler obtained the School's key to the pad-

locked, fenced area, opened the gate, and climbed the tower, where he was electrocuted. Lacking facts indicating that PMU had affirmatively undertaken a duty to insure the safety of those entering into the padlocked fence, we conclude that the Butlers have failed to demonstrate the existence of an issue of fact on the question of whether PMU gratuitously assumed a duty.

5.

Having concluded that the trial court was correct in determining that PMU did not owe a duty to James Butler and that PMU was therefore entitled to summary judgment, we need not decide whether James Butler was contributorily negligent as a matter of law.

Judgment affirmed.

KIRSCH, J. and MATTINGLY, J., concur.